BRENT W. RENISON, OSB No. 96475
E-mail:  brent@entrylaw.com
Direct Dial:  (503) 597-7190
Fax:  (503) 726-0730
PARRILLI RENISON LLC
610 SW Broadway Suite 505
Portland, OR 97205

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| LUDOVIC PIERRE BERARDO, | Civil No.  3:19-cv-1796 |
| PLAINTIFF, | |
| v. | COMPLAINT |
| UNITED STATES CITIZENSHIP AND IMMIGRATION SERVICES; and LOREN K. MILLER, Director, USCIS Nebraska Service Center, | |
| DEFENDANTS. | |

**COMPLAINT**

Plaintiff alleges as follows:

**JURISDICTION**

1. This Court has jurisdiction pursuant to 28 U.S.C. § 1331 (federal question) and causes of action under the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 et seq., and the Declaratory Judgment Act, 28 U.S.C. § 2201(a).

## VENUE

2.  Venue in this district is proper under 28 U.S.C. § 1391(e)(3) because no real property is involved in the action and Plaintiff resides in Portland, Oregon.

## PARTIES

3.  Plaintiff, Ludovic Pierre Berardo, is a citizen of the Belgium residing in Portland, Oregon and is employed by world renowned animation studio LAIKA LLC in Hillsboro, Oregon pursuant to an O-1 visa for aliens of extraordinary achievement.

4.  Defendant United States Citizenship and Immigration Services ("USCIS") is the agency within the Department of Homeland Security which is responsible for adjudicating immigrant visa petitions.

5.  Defendant Loren K. Miller is sued in his official capacity as Director of the Nebraska Service Center (NSC) of the USCIS. As Director of the NSC, Mr. Miller is responsible for overseeing the administration of benefits, including the immigrant petition process.

## STATUTORY BACKGROUND

6.  The Immigration and Nationality Act ("INA") provides for preferential immigration status for aliens of extraordinary ability who have demonstrated sustained national or international acclaim and whose achievements have been recognized in the field through extensive documentation. The alien must seek to continue work in the area of extraordinary ability, and substantially benefit prospectively the United States. INA § 203(b)(1)(A); 8 U.S.C. § 1153(b)(1)(A).

7.  The INA also provides that the alien, or a person on behalf of the alien, may petition for classification as an alien of extraordinary ability. INA § 204(a)(1)(E); 8 U.S.C. § 1154(a)(1)(E).

8.  The agency, USCIS, promulgated regulations at 8 C.F.R. § 204.5(h) which describe the meaning of extraordinary ability, and set out the types of documentation that can be

submitted in order to establish eligibility.

9. The regulations require evidence of a one-time achievement such as a major, international recognized award, or 3 of a list of 10 criteria. 8 C.F.R. § 204.5(h)(3)(i)-(x) (listing the 10 areas of documentation.

10. Once the evidentiary burden has been met by establishing a one-time achievement, or in the alternative 3 of the 10 criteria, the regulations require a determination whether the evidence demonstrates both a "level of expertise indicating that the individual is one of that small percentage who have risen to the very top of the[ir] field of endeavor," 8 C.F.R. § 204.5(h)(2), and "that the alien has sustained national or international acclaim and that his or her achievements have been recognized in the field of expertise." 8 C.F.R. § 204.5(h)(3). See *Kazarian v. USCIS*, 596 F.3d 1115, 1119-20 (9th Cir. 2010); *Rijal v. USCIS*, 772 F.Supp.2d 1339 (W.D. Wash 2011)

11. USCIS utilizes a preponderance of the evidence standard in adjudicating evidence submitted in support of immigrant petitions.

## FACTS

12. On April 4, 2019, Plaintiff filed an immigrant petition on Form I-140 with Defendant USCIS at the Nebraska Service Center (NSC). The petition was assigned a receipt number LIN1990370568.

13. The I-140 petition was accompanied by a $700 filing fee. The Receipt Notice acknowledged receipt of the fee.

14. The I-140 petition was filed as a self-petition and requested classification of Plaintiff as an alien of extraordinary ability under INA Section § 203(b)(1)(A), 8 U.S.C. § 1153(b)(1)(A).

15. The I-140 petition was accompanied by evidence claiming eligibility under 6 of the ten criteria, three more than is required by the regulation.

16. On June 11, 2019, Defendant USCIS issued Plaintiff a Request for Evidence

(RFE) requiring submission of additional evidence under signature of Defendant Loren K. Miller, Director of the NSC.

17.     The RFE requested additional evidence of Plaintiff's record of sustained national or international acclaim, stating that none of the criteria had been met.

18.     On August 24, 2019, Plaintiff filed a response to the RFE.

19.     Plaintiff's RFE response claimed eligibility under 5 of the 10 criteria, although only three were required for approval, and provided over 200 pages of evidence, including a letter from counsel that provided additional details on the submitted evidence and Plaintiff's record of sustained national or international acclaim.

20.     On October 2, 2019, Defendant USCIS issued a denial under signature of Defendant Miller. The denial stated that Plaintiff had failed to prove by a preponderance of the evidence that any three of the ten criteria applied, and that Plaintiff did not establish a record of sustained national or international acclaim.

21.     The I-140 petition and RFE response included published material about the Plaintiff in professional or major trade publications, relating to the alien's work as a Stop-Motion Animator, to satisfy the criteria at 8 C.F.R. § 204.5(h)(3)(iii).

22.     The denial states, "The plain language of this criterion requires the evidence to be primarily about you relating to your work in the field … However, the articles were not primarily about you, but inclusive of other individuals and your work—published material must not simply be about your work, but about you—though it may not be unrelated to your work."

23.     The published material included the article "Anja Poland & Ludovic Berardo on the Creative Craft of LAIKA Magic" published by *Animation Magazine*. The article features Plaintiff and his lead role as an Animator at LAIKA, one of the world's leading stop-motion animation studios. The article goes into depth on Plaintiff's "crucial" role at the award-winning studio and reads, in part, "After working on movies and shows around Europe, he [Plaintiff] joined LAIKA six years ago on the crew of *ParaNorman*. 'In 2D, there's no limit to your

imagination, but it exists only in two dimensions. And that's what I love so much about stop motion. I can touch my characters; move them around in their world, but in my dimension,' says Berardo. 'And, I like to feel like a giant giving life to these beautiful puppets.' … On [*Kubo and the Two Strings*], for instance, Berardo became known as the 'walk animator.' … This rep was built by his work on a sequence in which Kubo, Monkey and Beetle are walking through the forest, across uneven ground. This seemingly simple promenade took more than six months to complete and was, Berardo says, 'the most challenging thing I've ever done.'"

24. The published material also included the article "A First Time for Everything: Judging the 9th Edition of the Montreal Stop Motion Film Festival" published by Animation World Network. The article reads, in part, "[Rachelle] Lambden served as a judge at the ninth edition of the Festival Stop Motion Montreal … alongside fellow jurors Dale Hayward and Ludovic (Ludo) Berardo to select the winners in three categories." The article breaks down the film festival categories and how Plaintiff and his fellow jurors decided the winners of each category.

25. The published material detailed in Paragraphs 23 and 24 was about Plaintiff relating to his work in the field of animation.

26. Of the published material submitted to satisfy the criteria at 8 C.F.R. § 204.5(h)(3)(iii), the denial also states, "The RFE response does not demonstrate that the sources submitted in response, specifically online Animation Magazine and online Animation World Network are major media or professional or major trade publications. Some published material such as journal or newspaper articles can be found in both print and digital format. However, this is not true of all material found on the internet, and thus not all may be equivalent to material with stringent vetting and high standards for publication. The following issues are often inherent in internet publishing making them less probative than documents published by a publishing house or major news organization: dates of publication and timeliness of information are questionable on the Internet; dates listed on Web sites could be the date posted, date updated, or

may not be listed at all; this material is not guaranteed to go through a fact-check or review process by editors which will ensure the quality of the publication and information; the internet site may have an undisclosed bias or be used to market products; and if authors are named, there is no way to verify if they are journalists or qualified sources. Based on our review of the record, we do not find published material about you in professional or major trade publications or other major media, relating to your work in the field, consistent with the language of this regulatory criterion. As such, the evidence does not support that this criterion has been met."

27. The articles submitted in the I-140 petition and RFE response were published by *Animation Magazine* and Animation World Network. The articles submitted included the title, date, and author of the material, as required by the regulation. The articles were published in English, and no translation was necessary. Evidence about both magazines and their respective readership and distribution were also submitted to establish their standing as major publications.

28. According to the evidence submitted with the I-140 and RFE response, *Animation Magazine* publishes a print magazine every month, in addition to publishing content online. *Animation Magazine*'s advertising information states, "*Animation Magazine*'s website complements the long history and recognized success of the print version. It adds significant value to the magazine by establishing a community for the animation industry with the convenience and immediacy of the Internet. As we continue to grow our website, we reaffirm *Animation Magazine*'s position as 'The Animation Authority.'" *Animation Magazine* has readers from over 140 countries and their target readership is "compromised of industry decision-makers and professional creatives." Animation magazine has over 20,000 print subscribers, in addition to 20,000 e-newsletter subscribers. The *Animation Magazine* website attracts over 150,000 unique visitors each month. 22% of *Animation Magazine* readers are involved in the television industry; 17% of *Animation Magazine* readers are involved in feature films; 16% are involved at schools and universities. *Animation Magazine* is a major industry publication.

29. According to the evidence submitted with the I-140 and RFE response, Animation

World Network is "the largest animation-related publishing group on the Internet, providing readers from over 151 countries with a wide range of interesting, relevant and helpful information pertaining to all aspects of animation. … AWN's comprehensive and targeted coverage of the international animation community has made it the leading source of animation industry news in the world. Hundreds of thousands of animation professionals, educators, broadcasters, students and enthusiasts stay in touch with AWN to get the facts, figures, features and in-depth coverage they can't get anywhere else." 72% of AWN's audience are directly involved in production animation, visual effects (VFX), or games. AWN has over 15,000 unique readers daily, over 200,000 unique readers monthly, and over 100,000 subscribers of their weekly newsletter. Animation World Network is a major industry publication.

30. Defendants did not recount the evidence described in Paragraphs 28 and 29 in the denial decision.

31. Defendants did not consider the evidence described in Paragraphs 28 and 29.

32. The I-140 petition and RFE response included evidence of Plaintiff's participation, either individually or on a panel, as a judge of the work of others in the same or an allied field to satisfy the criteria at 8 C.F.R. § 204.5(h)(3)(iv).

33. The denial decision states, "The plain language of this criterion requires participation of the beneficiary either individually or on a panel, as a judge of the work of others in the same or an allied field of endeavor. You submitted a Stop Motion festival brochure … However, this document only lists that you were among other jurors for this festival; it does not demonstrate whether you served as a judge, and at what level, such as independent and objective documentation about an event or occasion where you served as judge, the work that you judged, the level of the participants, nor how you were selected as an official judge. The phrase "a judge" implies a formal designation in a judging capacity, either individually or on a panel, as specified pursuant to the regulation … Thus, without substantive evidence of your participation as a judge of the work of others in your field or an allied field which is consistent with sustained national or

international acclaim, USCIS cannot conclude that you meet this criterion."

34. Plaintiff served as a jury member at the prestigious international film festival Festival Stop-Motion Montreal for its ninth season in September 2017. The festival program submitted with the I-140 petition and RFE response included detailed information on the expertise of each juror, the prestige of the films judged, and the categories in which the films would be judged. The following is excerpted from the program: "The Festival consists of 87 short films in three different competition categories. The films come from all over the world. A jury of professionals from the animation film industry choose a winner for each category, and the public votes to elect the winner of the Audience Choice award. The Festival selects a winner in each of the categories of competition: Emerging Talent, Independent, and Professional. The Award each winner receives is called 'The Little Henry.'"

35. Plaintiff's role as a jury member at the Festival Stop-Motion Montreal was also covered in the media, as evidenced by the Animation World Network article "A First Time for Everything: Judging the 9th Edition of the Montreal Stop Motion Film Festival" documented previously.

36. Contrary to the assertion in Paragraph 33, independent and objective documentation about Plaintiff's service as a judge (jury member) in a formal designation in a judging capacity, on a panel, as specified pursuant to the regulation, was submitted in the I-140 and RFE response.

37. Defendants failed to consider the evidence, and misconstrued and misinterpreted the evidence, described in Paragraphs 34 and 35.

38. Also submitted to satisfy the criteria at 8 C.F.R. § 204.5(h)(3)(iv) was evidence of Plaintiff's participation as a juror at the acclaimed eighth annual Northwest Animation Festival in 2018. The submitted evidence included a list of all the screened films, a juror list, and information about the Northwest Animation Festival. The information submitted about the film jurors states: "All entries were reviewed by members of our jury—a hand-picked team of 130

festival alumni, local animators, and super-fans. On average, each film was scored by seven jurors. Scores were tallied, selection was based on rank, and our cutoff was determined by available screen time."

39. The evidence described in Paragraph 38 was not recounted in the RFE or in the denial decision.

40. Defendants did not consider the evidence described in Paragraph 38.

41. The I-140 petition and RFE response included evidence of the display of work in the field of Stop-Motion Animation at artistic exhibitions and showcases to satisfy the criteria at 8 C.F.R. § 204.5(h)(3)(vii).

42. The denial decision states, "You wish to use the 2017-2018 display of Animating Life: the Art, Science, and Wonder of LAIKA at the Portland Museum, Portland OR; LAIKA live, in San Diego coinciding with the city's Pride celebration and Comic-Con mega-event; and Fete De L'Anim. … All three events are focused on the company, LAIKA and the works of its visionary artistry and technology studio. Even if you were a speaker or provided a program at the event, you are not the visual artist where the event is attributed to you. Further, the petitioner has not demonstrated his regular participation in shows or exhibitions at major venues devoted to the display of his work alone. USCIS finds no evidence that exhibitions in which your works appeared to have a national reputation or that participation in such exhibitions was a privilege extended only to top national or international artists. USCIS finds no evidence that exhibitions in which your works appeared to have a national reputation or that participation in such exhibitions was a privilege extended only to top national or international artists. … As such, the evidence does not support that this criterion has been met."

43. The regulations for this criterion require "Evidence of the display of the alien's work in the field at artistic exhibitions or showcases."

44. Plaintiff submitted the "Animating Life: The Art, Science, and Wonder of LAIKA" exhibit held at the prestigious Portland Art Museum from October 2017 to May 2018 as

evidence of the display of his work in the field of stop-motion animation. The Portland Art Museum says of the exhibit, "At the heart of every LAIKA film are the artists who meticulously craft every element. Through behind-the-scenes photography, video clips and physical artwork from its films, visitors will be immersed in LAIKA's creative process, exploring the production design, sets, props, puppets, costumes, and world-building that have become the studio's hallmarks. Their films are a triumph of imagination, ingenuity and craftsmanship and have redefined the limits of modern animation." Plaintiff served as Animator on three of the Academy Award-nominated films presented at the "Animating Life" exhibit, and Plaintiff also presented at one of the monthly events called "LAIKA Sundays" that were held in conjunction with the exhibit. LAIKA Sundays included "opportunities to meet some of the incredible artists who make the magic happen behind the scenes." Plaintiff was one of the "incredible artists" that presented at a LAIKA Sunday event on May 20, 2018. Plaintiff presented alongside Chris Butler, the Academy Award-nominated writer and director, and Arianne Sutner, the Academy Award-nominated producer. The Portland Art Museum is the oldest museum in the Pacific Northwest region of the United States and is internationally recognized for its permanent collection and special exhibitions.

45. Plaintiff's work as Animator on four LAIKA films—three of which have received Academy Award nominations—was also displayed at the LAIKA Live exhibit in San Diego, California. Evidence of the LAIKA Live exhibit was submitted with the I-140 petition and RFE response. Press coverage of the event states, "Further highlights of this pop-up museum of puppetry include demos of the innovative technology used in LAIKA's films … Visitors will also have access to curators explaining the LAIKA filmmaking process." As a LAIKA Animator, Plaintiff is directly involved with the filmmaking process and technology used to create LAIKA's award-winning productions.

46. Also submitted to satisfy the criteria at 8 C.F.R. § 204.5(h)(3)(vii) was evidence of the display of Plaintiff's work at the prestigious Fete De L'Anim international film festival in

2018. In addition to presenting his work as an Animator on the LAIKA films *Kubo and the Two Strings* and *The Boxtrolls* for the festival, Plaintiff taught an animation Masterclass.

47. Plaintiff submitted evidence of the display of his work in the field of Stop-Motion Animation at artistic exhibitions and showcases.

48. Also submitted to satisfy the criteria at 8 C.F.R. § 204.5(h)(3)(vii) was evidence of the display of Plaintiff's work at Universal Studios Hollywood for the event "A Magical LAIKA Experience." The special event took place in the Globe Theatre at Universal Studios Hollywood. Press about the event, which was submitted with the I-140 petition and RFE response, states, "[G]uests at Universal Studios Hollywood can experience *From Coraline to Kubo: A Magical LAIKA Experience* inside the Globe Theatre located next to Despicable Me: Minion Mayhem. The experience allows guests to get a behind-the-scenes glimpse of some of LAIKA's stop motion animated films, including *Coraline, ParaNorman, The Boxtrolls* and *Kubo and the Two Strings*." Plaintiff served as Animator on *ParaNorman, The Boxtrolls*, and *Kubo and The Two Strings*, and his work in the field was presented at "A Magical LAIKA Experience" at Universal Studios Hollywood.

49. Defendants did not recount the evidence described in Paragraph 47 in the RFE or in the denial decision.

50. Defendants failed to consider the evidence described in Paragraph 47.

51. The I-140 petition and RFE response included evidence of Plaintiff's performance in a leading or critical role for organizations or establishments that have a distinguished reputation to satisfy the criteria at 8 C.F.R. § 204.5(h)(3)(viii).

52. The denial decision states, "The RFE response provided no new evidence by focused on the letter from Brad Schiff, Animation Supervisor at LAIKA. He praised your [Plaintiff's] work as 'one of the most extraordinary animators working in the field today'; his [Plaintiff's] work is innovative, emotive and has proved central to LAIKA's commercial success and acclaim.' You [Plaintiff] bring attention to a magazine article in Animation Magazine that

focused on LAIKA's 'reinvigorating stop-motion animated feature landscape in the US and around the world' since 2005. The article continued with other 'crucial members', including you, to learn more about how 'creativity and innovations combine to make LAIKA movie magic.' However, the evidence does not contain the organizational chart of LAIKA to determine where in the company, your role is listed or all the various departments within said company. As an animator, the evidence does not place your position to be in the hierarchy of leading or critical within LAIKA nor does it rise to the level of leading or critical consistent with this regulatory criterion. The letter from your supervisor praises your work, but does not elevate your role even within his department as critical or leading within the department or the entire company; nor does it distinguishes [sic] you from other animators within the department or company."

53. The denial decision admits that the letter from Mr. Brad Schiff, Animation Supervisor at LAIKA, says that Plaintiff "has proved central to LAIKA's commercial success and acclaim" and that Plaintiff's "crucial" role has been covered by the press.

54. Contrary to the assertion in Paragraph 53, the plain language of the regulations at 8 C.F.R. § 204.5(h)(3)(viii) do not require that aliens submit a company's organization chart as evidence of their lead or critical role for organizations or establishments that have a distinguished reputation. The regulations at 8 C.F.R. § 204.5(h)(3)(viii) require "[e]vidence that the alien has performed in a leading or critical role for organizations or establishments that have a distinguished reputation."

55. Mr. Schiff's letter also states, "On *The Boxtrolls*, Ludovic was one of my character leads for two of the films [sic] protagonists, Eggs and Winnie. He helped develop and set the tones of these characters for the rest of the animation team to follow throughout the shoot. On our Kubo and the Two Strings, I utilized Ludovic as the lead on one of our most important and complex sequences. … Ludovic's work has been instrumental to the success of our Academy Award nominated films *Paranorman, The Boxtrolls* and *Kubo and the Two Strings*. His work on our most recent film, Missing Link released in April of this year [2019] dwarfs his

previous contributions. Ludovic's work is innovative, emotive and has proven central to LAIKA's commercial success and acclaim. Ludovic's world-class visuals have been used to create the trailer for *Kubo and the Two Strings* and *Missing Link* showcasing the film for audiences domestically and internationally. His work was also imaged in promotional posters for the films as well. Because of their significant nature, only our most gifted animators will pose for promotion posters. … As the Animation Supervisor, for LAIKA, I can attest without a doubt that Ludovic has contributed greatly to the first-rate animation of our Studio. Animators of the caliber of Ludovic are a rarity in the industry. His innovation, accuracy and skill breathe life into the characters that he animates and he elevates the animation team through his guidance. … In summary, Ludovic has served as a key animator on four of LAIKA's productions to date. His all-star performances on these productions translate directly into our organization's reputation in the field, box office receipts, and critical acclaim."

56. The evidence presented in Paragraph 55 was further addressed in counsel's letter submitted with the RFE response.

57. The denial decision did not recount the evidence in Paragraph 55.

58. Plaintiff provided evidence of his lead and critical role at LAIKA to satisfy the criteria at 8 C.F.R. § 204.5(h)(3)(viii).

59. The I-140 petition and RFE response included evidence that Plaintiff has commanded a high salary or other significantly high remuneration for services, in relation to others in the field, to satisfy the criteria at 8 C.F.R. § 204.5(h)(3)(ix).

60. The denial states that "the salary data does not distinguish among levels of expertise, education, and years of experience. There was no evidence to demonstrate similar wages with other stop animators within LAIKA or similar companies that employ stop animators, with similar levels of expertise, education, and years of experience."

61. The regulations at 8 C.F.R. § 204.5(h)(3)(ix) require "[e]vidence that the alien has commanded a high salary or other significantly high remuneration for services, in relation to

others in the field."

62. The evidence regarding Plaintiff's salary showed $128,408 in remuneration in 2018 and $120,386 as documented by Plaintiff's IRS Forms W-2 for these years, and recent paystubs for his work at LAIKA. Plaintiff also provided private salary surveys from GlassDoor, ZipRecruiter, and LinkedIn that document average animator salaries in the Portland, Oregon area between $63,000 to $78,000 per year, with the highest wage in the field as $110,314.

63. This evidence contains objective earnings data and establishes that Plaintiff's remuneration was high in relation to others in his field.

64. Plaintiff's achievements set him apart as one of a small percentage of Stop-Motion Animators who have risen to the top of this highly specialized and competitive field. He serves in a lead and critical role as one of the lead animators at LAIKA, the studio which sets the global standard for stop-motion animation, and he earns significantly high remuneration for his services in comparison to others in his field. Plaintiff's extraordinary work as a Stop-Motion Animator on LAIKA's Academy Award-nominated films has been recognized in the press and been displayed at international exhibitions, from Canada to the United States to France. Plaintiff's extraordinary abilities and leadership in the field of Stop-Motion Animation has landed him several positions as a judge at international film festivals, including the prestigious Festival Stop-Motion Montreal.

65. Ludovic Berardo has all the indicia of an individual of extraordinary ability who will benefit the United States by bringing the magic of stop-motion animation to millions of viewers across the United States and around the world.

## CLAIM FOR RELIEF

### Agency Action That Is Arbitrary, Capricious, An Abuse of Discretion or Not In Accordance With Law

66. The APA 5 U.S.C. § 706(2)(A), provides the Court with the authority to hold unlawful and set aside agency action that is arbitrary, capricious, an abuse of discretion, or

otherwise not in accordance with the law.

67. Plaintiff met his burden of proving, by the preponderance of the evidence, that he met at least 3 of the 10 criteria 8 C.F.R. § 204.5(h).

68. Plaintiff was prejudiced and adversely affected and aggrieved by the USCIS determination that he lacked the prerequisite evidentiary showing because he is one of a small percentage of animators who have risen to the very top of the field, and because he has received sustained national or international acclaim for achievements which have been recognized in the field of animation and Defendants' failure to consider his final merits determination under 8 C.F.R. § 204.5(h)(2) and (3), following Defendants' misapplication of the regulations to the evidentiary requirements deprived him of a decision in accordance with the law.

69. Defendants' interpretation of the regulatory requirement of "published material about the alien in professional or major trade publications or other major media, relating to the alien's work in the field" to document the criteria at 8 C.F.R. § 204.5(h)(iii) as requiring that the published material "must be *primarily* about the petitioner" is arbitrary, capricious or not otherwise in accordance with law as it injects a requirement – <u>primarily</u> – that is not found in the regulation. The regulation requires published material "about the alien" "relating to the alien's work in the field" and does not require that the material be "*primarily* about" the alien. Defendants may not "unilaterally impose novel substantive or evidentiary requirements" beyond those set forth in the regulations. *Kazarian v. USCIS*, 596 F.3d 1115, 1121 (9th Cir. 2010).

70. Plaintiff established by a preponderance of the evidence that there was published material about him in professional or major trade publications or other major media, relating to his work in the field and Defendants discounted this evidence because the articles included other individuals and because Defendants ignored the status of the publications which was action that was arbitrary, capricious, an abuse of discretion or not otherwise in accordance with law.

71. Plaintiff established by a preponderance of the evidence that he served as a jury member of not one but two animation festivals where he judged the work of others, and service

as a jury member qualifies as serving as a judge of the work of others in the same field.

72. Defendants concluded that evidence of Plaintiff's service as a jury member at an animation festival judging animation films produced by other animators was not the same as being "a judge of the work of others", a conclusion which is not only preposterous but arbitrary, capricious, an abuse of discretion or not otherwise in accordance with law.

73. Defendants admitted that Plaintiff was a speaker at an artistic exhibition which displayed his work as an animator for LAIKA and Defendants claimed that the work focused on the company's works, complaining that plaintiff did not show "regular" participation in exhibitions of his work alone, which was action that was arbitrary, capricious, an abuse of discretion or not otherwise in accordance with law. Plaintiff's work has appeared in animation exhibitions in Portland, San Diego, and France.

74. Defendants ignored an important aspect of the problem, namely that Plaintiff is a leading animator at a major animation film studio producing Academy Award nominated films and that his invited participation in highlighting his work at the artistic exhibitions is evidence of the display of his work in the field at artistic exhibitions, and that he is not a solo artist holding solo events for his artistry. Defendants unilaterally imposed novel substantive and evidentiary standards in requiring Plaintiff to show he was the featured artist in these exhibitions, rather than show that his work was displayed at festivals as the regulations require. This action was arbitrary, capricious, an abuse of discretion or not otherwise in accordance with law.

75. Plaintiff documented his leading and critical role through detailed and probative evidence of his leading animation of leading characters and showing that animators in stop-motion animated films are the actors in these films. Defendants instead claimed that an organizational chart had not been submitted showing where in the company hierarchy Plaintiff fell, which represents a fundamental disregard of the evidence submitted, action which was arbitrary, capricious, an abuse of discretion or not otherwise in accordance with law.

76. Defendants Plaintiff's salary is a high salary in relation to others in the field.

77. Plaintiff established by a preponderance of the evidence that he has commanded a high salary in relation to others in the field of animation.

78. Defendants recognized Plaintiff's submission of his 2017 and 2018 W-2 Forms reflecting a salary of $120,386 for 2017 and $128,408 for 2018 but failed to recognize the validity of salary surveys submitted to show Plaintiff's salary was high in relation to others.

79. Defendants claim the salary data does not distinguish among levels of expertise, education and years of experience. The salary surveys showed lowest, median and highest salaries in the industry, encompassing the entire spectrum of experience and Plaintiff's salary was higher than the highest range of salaries (the top decile) in each survey. Defendants' disregard of this evidence as not sufficient to prove by a preponderance of the evidence that Plaintiff's salary was high in relation to others was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law.

80. Defendant disregarded probative evidence submitted by Plaintiff in the record, failing to acknowledge or discuss the evidence, which was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court:

1. Assume jurisdiction over this action;
2. Declare that Plaintiff has met his burden of proving by the preponderance of the evidence that he submitted evidence of at least 3 of the 10 required criteria of 8 C.F.R. § 204.5(h)(i) – (ix);
3. Declare that Plaintiff has established by the preponderance of the evidence that he is one of a small percentage of animators who have risen to the very top of the field, and has received sustained national or international acclaim for achievements which have been recognized in the field of animation, in accordance with 8 C.F.R. § 204.5(h)(2) and (3);

4. Declare that Defendants' decision denying the petition requesting classification as an alien of extraordinary ability was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law pursuant to 5 U.S.C. § 706(2)(A);

5. Order Defendants to vacate the denial of the I-140 immigrant petition and enter a decision approving the classification;

6. Award plaintiff reasonable costs and attorney's fees under the Equal Access to Justice Act; and

7. Award such further relief as the Court deems necessary or proper.

DATED this 7th day of November 2019.

PARRILLI RENISON LLC

By /s/ Brent W. Renison
BRENT W. RENISON, OSB No. 96475
E-mail:  brent@entrylaw.com
Phone:  (503) 597-7190