Brent W. Renison, OSB No. 96475
E-mail:  brent@entrylaw.com
Direct Dial:  (503) 597-7190
Fax:  (503) 726-0730
PARRILLI RENISON LLC
610 SW Broadway Suite 505
Portland, OR 97205

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| LUDOVIC PIERRE BERARDO, | Civil No.  3:19-cv-1796-SB |
| PLAINTIFF, | |
| v. | |
| | AMENDED MOTION FOR SUMMARY JUDGMENT |
| UNITED STATES CITIZENSHIP AND IMMIGRATION SERVICES; and LOREN K. MILLER, Director, USCIS Nebraska Service Center, | |
| DEFENDANTS. | |

## Table of Contents

**MOTION FOR SUMMARY JUDGMENT** ................................................................1

**CERTIFICATION PURSUANT TO LR 7-1** ........................................................1

**MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** ..........1

    **I.**         **Introduction and background**.............................................1

    **II.**        **Statutory Background** .....................................................2

**ARGUMENT** .............................................................................................3

    **I.**         **Summary Judgment Standard and Administrative Procedure Act Review** .....................................................................3

    **II.**        **Defendants' Decision Was Not Based on a Consideration of the Relevant Factors and Reflects a Clear Error of Judgment and Lacks a Rational Connection Between the Facts Found and the Choice Made** .................................................................4

        **A.**    **8 C.F.R. § 204.5(h)(3)(iii) (Published material)**................................4

        **B.**    **8 C.F.R. § 204.5(h)(3)(iv) (participation as a judge of the work of others)** ......................................................................7

        **C.**    **8 C.F.R. § 204.5(h)(3)(vii) (evidence of the display of the alien's work in the field at artistic exhibitions)** .............................................9

        **D.**    **8 C.F.R. § 204.5(h)(3)(viii) (leading or critical role for distinguished organization)** .............................................13

        **E.**    **8 C.F.R. § 204.5(h)(3)(ix) (high salary)** ............................................19

        **F.**    **8 C.F.R. § 204.5(h)(3)(x) (evidence of commercial success)** ...........24

    **III.**       **Final Merits analysis**.............................................................25

    **IV.**       **Conclusion** .................................................................33

## Table of Authorities

**Cases**

*3Q Digital, Inc., v. USCIS*, 1:19-cv-579-RCL (D.D.C. March 6, 2020) ................................33

*Burlington Truck Lines v. United States*, 371 U.S. 156, 168, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962) 3

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) .............3

*Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416 (1971)..................................33

*Eguchi v. Kelly*, 3:16-cv-1286-D (N.D. Texas 2017) .............................................................23

*In Re: 1852444* (AAO Dec. 5, 2019)....................................................................................25

*Kazarian v. USCIS*, 596 F.3d 1115, 1119-20 (9th Cir. 2010)....................................3, 6, 25, 32

*Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983)........................................................................................3, 25

*Muni v. INS*, 891 F.Supp. 440 (N.D. Ill. 1995)......................................................................23

*Nat'l Wildlife Fed. V. Nat'l Marine Fisheries Serv.*, 524 F.3d 917, 927 (9th Cir. 2008)..........3

*Nat'l. Wildlife Fed. v. Espy*, 45 F.3d 1337, 1343 (9th Cir. 1995)............................................34

*Relx, Inc. v. Baran*, 397 F.Supp. 3d 41, 56 (D.D.C. 2019).....................................................33

*Rijal v. USCIS*, 772 F.Supp.2d 1339 (W.D. Wash 2011), aff'd, 683 F.3d 1030 (9th Cir. 2012)3, 25

*San Luis & Delta-Mendota Water Auth. V. Jewell*, 747 F.3d 581, 601 (9th Cir. 2014) ............3

**Statutes**

8 U.S.C. § 1153(b)(1)(A)........................................................................................................2

INA § 203(b)(1)(A)...............................................................................................................2

**Other Authorities**

AFM Chapter 22, 22.2(i)(1)(A) .......................................................................................19, 25

USCIS Policy Manual, Chapter 11, Sec. 11.2(a)....................................................................10

Webster's Third New Int'l Dictionary 2304 (unabridged ed 2002)........................................29

**Rules**

8 C.F.R. § 204.5(h)(3)(ix)................................................................................................19, 23

8 C.F.R. § 204.5(h)(3)(viii)..............................................................................................13, 14

Federal Rule of Civil Procedure 56(a) ...................................................................................1, 3

FRE, Rule 1001.................................................................................................................11

LR 7-1 .................................................................................................................................1

**Regulations**

8 C.F.R. § 103.2(b)(1).........................................................................................................22

8 C.F.R. § 204.5 ..................................................................................................................6

8 C.F.R. § 204.5(h) .............................................................................................................2

8 C.F.R. § 204.5(h)(2)..........................................................................................................2

8 C.F.R. § 204.5(h)(3)..........................................................................................................3

8 C.F.R. § 204.5(h)(3)(iii)....................................................................................................4

8 C.F.R. § 204.5(h)(3)(iv)..................................................................................................7, 9

8 C.F.R. § 204.5(h)(3)(vii)...................................................................................................9

8 C.F.R. § 204.5(h)(3)(x).....................................................................................................24

**MOTION FOR SUMMARY JUDGMENT**

Plaintiff moves for entry of summary judgment pursuant to Federal Rule of Civil Procedure 56(a).

This Motion for Summary Judgment is based on the Court's file and based upon the Certified Administrative Record filed in this case by defendants, and the following memorandum of law.

**CERTIFICATION PURSUANT TO LR 7-1**

In compliance with LR 7-1, undersigned counsel certifies that he conferred with defendants' counsel in good faith regarding this motion, and defendants' counsel stated that she intends to oppose it.

**MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

**I.      Introduction and background**

Plaintiff, Ludovic Pierre Berardo, is a citizen of the Belgium residing in Portland, Oregon who is employed as a stop-motion animator by world renowned animation studio LAIKA LLC in Hillsboro, Oregon pursuant to an O-1 nonimmigrant visa for aliens of extraordinary achievement. Seeking to remain in the United States permanently and to continue to contribute to the renown of LAIKA's award winning stop-motion animated feature length motion pictures, Mr. Berardo filed a petition to be classified as an alien of extraordinary ability on April 4, 2019 (on Form I-140) with Defendant USCIS at the Nebraska Service Center (NSC). On June 11, 2019, defendant USCIS issued plaintiff a Request for Evidence (RFE) requiring submission of additional evidence, and on August 24, 2019, plaintiff filed a response to the RFE. On October 2, 2019, defendant USCIS issued a denial under signature of defendant Miller. The denial stated that plaintiff had failed to prove by a preponderance of the evidence that any three of the ten criteria applied, and that Plaintiff did not establish a record of sustained national or international acclaim.

Plaintiff filed this lawsuit to challenge the denial. Defendants responded by reopening the

AMENDED MOTION FOR SUMMARY JUDGMENT                                    – Page 1

October 2, 2019 denial (Denial I) and issuing a Notice of Intent to Deny (NOID) on December 20, 2019. The NOID admitted that, in contrast with Denial I, plaintiff <u>met</u> four criteria - 8 C.F.R. § 204.5(h)(3) subsections (iii) (published material), (iv) (judging), (vii) (display of work), and (x) (commercial success) - but found that plaintiff had <u>not</u> met two of the criterion (ix) (high salary), and (viii) (lead or critical role). Plaintiff responded to the NOID with additional evidence and legal argument on February 20, 2020, and defendants again denied the petition on April 3, 2020 (Denial II). In contrast with the pre-litigation Denial I, in which defendants did not recognize any of the criteria had been met, defendants in Denial II determined that plaintiff had met four of the six claimed criteria. Defendants, however, still discounted two of the criteria and found that "the totality of the evidence" did not establish Plaintiff as an individual of extraordinary ability.

## II.    Statutory Background

The Immigration and Nationality Act ("INA") provides for preferential immigration status for aliens of extraordinary ability who have demonstrated sustained national or international acclaim and whose achievements have been recognized in the field through extensive documentation.  The alien must seek to continue work in the area of extraordinary ability, and substantially benefit prospectively the United States.  INA § 203(b)(1)(A); 8 U.S.C. § 1153(b)(1)(A). USCIS promulgated regulations at 8 C.F.R. § 204.5(h) which describe the meaning of extraordinary ability and set out the types of documentation that can be submitted to establish eligibility. The regulations require evidence of a one-time achievement such as a major, internationally recognized award, or three of a list of ten criteria.  8 C.F.R. § 204.5(h)(3)(i)-(x) (listing the 10 areas of documentation). Once the evidentiary burden has been met by establishing a one-time achievement, or in the alternative three of the ten criteria, the regulations require a determination whether the evidence demonstrates both a "level of expertise indicating that the individual is one of that small percentage who have risen to the very top of the[ir] field of endeavor," 8 C.F.R. § 204.5(h)(2), and "that the alien has sustained national or international acclaim and that his or her achievements have been recognized in the field of expertise." 8

C.F.R. § 204.5(h)(3).  See *Kazarian v. USCIS*, 596 F.3d 1115, 1119-20 (9th Cir. 2010); *Rijal v. USCIS*, 772 F.Supp.2d 1339 (W.D. Wash 2011), aff'd, 683 F.3d 1030 (9th Cir. 2012). USCIS refers to this as the "final merits determination." USCIS utilizes a preponderance of the evidence standard in adjudicating evidence submitted in support of immigrant petitions.

## ARGUMENT

### I.   Summary Judgment Standard and Administrative Procedure Act Review

A party is entitled to summary judgment if there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The movant bears the burden of establishing the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Where a plaintiff brings their claims under the Administrative Procedure Act ("APA"), "an agency action must be upheld on review unless it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law.'" *San Luis & Delta-Mendota Water Auth. V. Jewell*, 747 F.3d 581, 601 (9th Cir. 2014). Courts "must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment" and "the standard of review is highly deferential; the agency's decision is entitled to a presumption of regularity, and [the court] may not substitute [its] judgment for that of the agency." *Id*. (quotation marks and citation omitted).

Despite this deference, courts "must engage in a careful, searching review to ensure that the agency has made a rational analysis and decision on the record before it." *Nat'l Wildlife Fed. V. Nat'l Marine Fisheries Serv.*, 524 F.3d 917, 927 (9th Cir. 2008). "[T]he agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983) (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962)).

**II.    Defendants' Decision Was Not Based on a Consideration of the Relevant Factors and Reflects a Clear Error of Judgment and Lacks a Rational Connection Between the Facts Found and the Choice Made**

A review of the Certified Administrative Record ("CAR")[1] will reveal that defendants disregarded relevant and probative evidence, mischaracterized evidence, unreasonably discounted evidence, misapplied legal standards, ignored important aspects of the problem, refused to review evidence, declined to discuss favorable evidence, and failed to reasonably apply the preponderance of the evidence standard to the evidence. Denial I (CAR p. 250) was so poorly decided that the agency reopened the decision (CAR p. 55) after being sued and formulated an entirely new Denial II (CAR p. 1). Post-litigation Denial II is so patently focused on negative aspects to the exclusion of evidence favorable to plaintiff that it not only lacks rational connection between the facts found and the choice made but carries indicia of a decision prepared for the purpose of shoring up defendants' litigation position. So extensive is defendants' caprice in Denial II that this motion cannot claim to do justice to the multitude of facts ignored and evidence wrongly disgraced. Defendants' Denial II exudes bad faith and shows an abuse of discretion and clear error of judgment.

**A.    8 C.F.R. § 204.5(h)(3)(iii) (Published material)**

Defendants found that the criterion found at 8 C.F.R. § 204.5(h)(3)(iii) (Published material) had been met. CAR p. 3. Defendants recognized that article "Anja Poland & Ludovic Berardo on the Creative Craft of LAIKA Magic" published by *Animation Magazine* on May 28, 2018 was evidence of published material about Plaintiff's work in his field in major trade

---

[1] The CAR was not available to undersigned counsel when the first motion for summary judgment was filed (ECF No. 17) and the instant amended motion is intended to be substituted for that first motion now that the CAR has been submitted into the record.

publications. See CAR p. 3 for Denial II language, and CAR pp. 530-39 for *Animation Magazine* article. Aside from crediting plaintiff with this one publication, however, USCIS did not fairly consider this extensive article in the most important animation magazine. The *Animation Magazine* article highlighted plaintiff's renown in the industry as the "walking animator", but nowhere in Denial II was this renown or achievement even mentioned let alone discussed. This is significant because a great deal of the evidence covering other criteria discuss and document his renown for being renowned as the walking animator. This significant piece of evidence in plaintiff's favor was entirely ignored. Nearly an entire page of the denial is devoted to discussing whether an *Animation World Network* article (CAR pp. 561-69) could be credited because in one part of the article there was a named author and no date and in the other part of the article appeared a date but no specific author's name other than the editors of the animation publication, and yet not a single mention of plaintiff's renown as the walking animator is made. CAR pp. 3-5.

Defendants acknowledged plaintiff's submission of a December 8, 2018 *Variety* magazine article about the European Animation Awards (EAA) in Lille, France, commenting on the awards and other notable happenings in the animation world, and stating,

> "This year the Fête de l'anim' extended its boarders [sic] and invited U.S. stop-motion producers Laika as the official studio of honor. The studio is responsible for films such as 'Coraline,' 'ParaNorman' and 'Kubo and the Two Strings.' Their upcoming film 'The Missing Link' is scheduled to release next year, and stars Hugh Jackman, Zoe Saldana, and Zach Galifianakis, and was one of the most talked-about films in production at this year's Annecy festival. Animator Ludovic Berardo represented the studio and shared behind-the-scenes secrets from the studio's productions and the studio itself

CAR p. 4. Defendants declined to consider this *Variety* magazine article, stating, "The fact that the self-petitioner is named in the article does not make the article about him." Denial II, CAR p. 5. The regulation requires:

AMENDED MOTION FOR SUMMARY JUDGMENT                                    – Page 5

"Published material about the alien in professional or major trade publications or other major media, relating to the alien's work in the field for which classification is sought. Such evidence shall include the title, date, and author of the material, and any necessary translation;"

8 C.F.R. § 204.5(h)(3)(iii). Defendants thus disregarded this magazine article relating to his representation of the studio of honor at a major film festival in France because it was not "about" him. This is an erroneous legal interpretation of the regulation which in connection with the article being about the alien requires that it "[relate] to the alien's work in the field…" The word "about" does not mean "primarily about" or even "mostly about" the alien (as Denial I first posited in denying even the *Animation Magazine* article because it also covered a costume fabricator, but which defendants removed from Denial II), nor does it mean whatever Denial II purports to mean. The word "about" just means regarding or relating to or concerning the person. That the regulation also repeats the requirement that the article be one "relating to the alien's work" and that is what we have here in the *Variety* magazine article. It must be about their work, not something unrelated to their work. Denial II seizes upon one early film mentioned in the article ("*Coraline*") which plaintiff did not work on, stating that this was evidence that the article focused on LAIKA, not on plaintiff. But this injects a requirement that is not found in the regulations, namely that the article focus on the plaintiff rather than be about him and relate to his work. See *Kazarian*, 596 F.3d at 1121 (the agency may not "unilaterally impose novel substantive or evidentiary requirements beyond those set forth at 8 C.F.R. § 204.5").

The *Variety* article explains plaintiff represented the studio of honor at the French film festival Fête de l'anim' and discusses the film Missing Link which it says was one of the most talked about movies of the festival, and one which plaintiff worked on extensively. CAR pp. 170-75. The defendants' narrow application of the word "about" in the regulation is not a

reasonable interpretation and the disregard of this evidence was a clear error of judgment. With only one credited article about him (out of three claimed), defendants determined in Denial II that he could not show his renown was "sustained." CAR p. 14. This flowed from the unreasonable interpretation of the word "about" and (as discussed below) focused on each individual factor as being sustained rather than the totality of the evidence showing sustained acclaim.

B.      8 C.F.R. § 204.5(h)(3)(iv) (participation as a judge of the work of others)

Defendants found that the criterion found at 8 C.F.R. § 204.5(h)(3)(iv) (participation as a judge of the work of others) had been met. CAR p. 5. Defendants recognized plaintiff's service as a jury member of the 2017 Festival Stop Motion Montreal in Canada, and the 2018 Northwest Animation Festival in the United States. Defendants found, however, this to be "minimal" evidence and that just two instances of judging animation film festivals was not evidence that Plaintiff was a top animator. CAR p. 14-15. Defendants improperly based this finding using assumptions about the number of judging instances for other unrelated fields.

The Denial II stated, "First, in other fields such as scientific research, acting as a judge or reviewing material for scientific journals is quite common. Thus, the statement that 'It would be expected that one at the top of his field would have many examples of serving as a judge' is based on experience reviewing other E11 petitions." Denial II, page 14, CAR p. 14. The field of animation is not the same field as "scientific research" and serving as a jury member for an animation festival, held in a physical location where a film festival is going on, where films are being screened, and where top talent is being evaluated for industry awards, is not comparable to reviewing scientific journals. Reviewing scientific journals would be expected to occur frequently in the academic community and does not require attendance and participation in a film

festival. Defendants improperly evaluated standards for reviewing scientific journals and applied them to jury participation in animation festivals which take place but once a year with judges viewing hundreds of films and meeting with other judges to determine the film's awards. Defendants ignored probative evidence in the record, namely LAIKA Animation Supervisor Brad Schiff's letter in which the animation expert stated,

> "The NOID makes an alarming assumption: 'It would be expected that one at the top of his field would have many examples of serving as a judge.' [citation omitted.] There is no basis for such an expectation. I can state, as an expert in the field of stop-motion animation, that being invited even once to serve as a juror in a major film festival is evidence of a stop-motion animator having risen to the top of the field and enjoying sustained national or international acclaim. Ludovic has had a long career spanning many of the most iconic stop-motion films in the world over more than a decade, and his service as a juror in 2017 and 2018, in festivals abroad and in the United States, is compelling evidence of his renown after having reached the pinnacle of his career."

CAR p. 123. In dismissing this expert's opinion by stating that it "adds little to the self-petitioner's case" defendants have ignored probative evidence. CAR p. 14. Defendants do not question Mr. Schiff as an expert or question his truthfulness or veracity. Defendants merely state that in scientific research cases, one would expect to see more instances of judging, and that for some unknown reason Mr. Schiff's statements are "not persuasive." Defendants also decided it was more important to know why Plaintiff was selected to be a juror than his actual service as a juror. Mr. Schiff's testimony that "It is evident to me as an industry expert that to be chosen to serve as a juror for a film festival and to judge and present awards for films one has garnered renown in the field" is the reason for plaintiff's selection as a juror at those film festivals. CAR p. 123. Defendants statement that "Film festivals may select judges for a variety of reasons, as is often seen with 'celebrity judges'" (CAR p. 15) fails to acknowledge that plaintiff is not a celebrity judge who has no degree of attainment in the field of animation but rather is an

AMENDED MOTION FOR SUMMARY JUDGMENT                                    – Page 8

acclaimed stop-motion animator working as a stop-motion animator for one of the world's premier stop-motion animation studios making stop-motion animated feature length movies which have all garnered Academy Award nominations and that this is more likely than not the reason Plaintiff was selected to serve as a juror. Defendants ignored the plain language of the regulation at 8 C.F.R. § 204.5(h)(3)(iv) which requires evidence of the alien's participation as a juror, and not evidence as to "why" they were selected. Defendants failed to properly consider the evidence of plaintiff's service as a juror at two animation festivals and failed to consider important aspects of the problem.

### C.    8 C.F.R. § 204.5(h)(3)(vii) (evidence of the display of the alien's work in the field at artistic exhibitions)

Defendants found that the criterion found at 8 C.F.R. § 204.5(h)(3)(vii) (evidence of the display of the alien's work in the field at artistic exhibitions) was met and recounted evidence in the record including the artistic exhibitions "Animating Life: The Art, Science and Wonder of LAIKA" at the Portland Art Museum ("PAM") (October 14, 2017 to May 20, 2018); Calendar listing from PAM for the May 20, 2018 service on a one-hour panel; LAIKA's Live exhibit in San Diego (July 13 to 22, 2018); the Fête de l'anim' festival in France held from December 5-9, 2018. CAR p. 5-7. Defendants recognized that the PAM and LAIKA Live event in San Diego as meeting the criterion because they were artistic exhibitions or showcases displaying the work created by plaintiff. Defendants did not, however, recognize the Fête de l'anim' event in France as a display of the work created by plaintiff, however, solely because at least one of the three LAIKA films screened at the Fête de l'anim' displayed no work of plaintiff (explaining on page 6 of Denial II that the movie *Coraline* was also displayed, and Plaintiff did not work on *Coraline*). CAR p. 6. Plaintiff was described in *Variety* magazine as sharing behind the scenes

AMENDED MOTION FOR SUMMARY JUDGMENT                                    – Page 9

secrets from the studio's productions and the studio itself during the Fête de l'anim' festival. CAR p. 173. Defendants failed to acknowledge or consider that during the Fête de l'anim' festival the feature films *The Boxtrolls*, and *Kubo and the Two Strings* (called Kubo and the magic armor in France) were screened and under each screening information it was noted, "In the presence of Ludovic Berardo, animator at Laika's studio." CAR p. 628 – 39. Plaintiff also taught an animation masterclass during the festival in France. CAR p. 637. These are critical pieces of evidence showing that plaintiff's work (his animation on both *The Boxtrolls* and *Kubo and the Two Strings*) was shown at artistic exhibitions or showcases. Defendants ignored the significance of this evidence and did not include it as attributing to the criterion.

Plaintiff submitted extensive video evidence, due to the nature of plaintiff's field of endeavor (stop-motion animation movies) and due to defendants' discounting of certain evidence submitted by plaintiff as outlined in the NOID. See FAC, ECF No. 13, ¶¶ 98-106. Defendants failed to review any of the video evidence submitted by plaintiffs in the form of DVDs and thumbdrives. CAR p. 247. Defendants stated that "Evidence submitted on removable media, such as thumb drives, flash drives, CDs, DVDs, etc., cannot be viewed on government computers and will not be considered." Denial II, p. 6, CAR p. 7. The USCIS Policy Manual, available online, includes a section under Chapter 11 "Evidence" which deals with video. The section is labeled 11.2 Video and Audio Taping, and under 11.2(a) states that,

> "In many instances the adjudicator may audio or video tape an interview with an applicant or petitioner. The purpose of such recording is to preserve evidence for possible use in later proceedings without expending significant resources creating a verbatim written record. Such recordings may be used as evidence for denying a benefit. However, if such a decision is subsequently appealed, it may be necessary to transcribe the text of the interview in order to introduce it before the immigration court or Board of Immigration Appeals."

USCIS Policy Manual, Chapter 11, Sec. 11.2(a). This shows USCIS has a policy of using video

evidence against applicants and petitioners, without first transcribing the video, including denial of a benefit. The USCIS Policy Manual also refers to the Federal Rules of Evidence (FRE) as a good reference for discussions of evidence. The FRE, Rule 1001, includes video evidence. Defendants failure to review Plaintiffs video evidence, in light of the agency's use of video evidence against applicants and petitioners to deny benefits and in light of the agency's adherence to the FRE which includes consideration of video evidence constitutes failure to consider an important aspect of the problem. Some of the submitted videos do not have any dialogue but are instead footage of Plaintiff animating key scenes in movies.[2] There is nothing to transcribe. Their evidentiary value lies in the video images, not the transcription of words. Defendants insistence on a full transcript of the videos, and failure to view the videos, is not in accordance with law and arbitrary and capricious.

Some of the submitted videos, however, were in fact accompanied by transcripts, but none of the substance of these transcripts was discussed in Denial II. These transcripts were wholly ignored. For example, plaintiff's submitted video evidence labeled EXH 12 was a video of *Kubo and the Two Strings* Director Commentary, wherein Travis Knight, the Director, discussed the scene that Plaintiff had animated involving the Monkey, Beetle and Kubo walking together. CAR pp. 206-212. As a written adjunct to the video commentary about Plaintiff's animation work, Plaintiff submitted a full transcript of the video. The transcript included this detail in relevant part:

> "And this is when the world really opens up, where we feel the characters' bond solidifying more than ever. This series of shots here were a combination of full-size sets and miniatures. It's the height of our heroes' connectivity, and

---

[2] See, for example, CAR p. 222, a page of screenshots from a video of plaintiff animating the running scene in the Himalayas from the movie Missing Link. This video had no sound.

everything comes together. The lighting, the cinematography, the color palette, the music, all to showcase the family's togetherness. Frank Passingham, our Director of Photography, shot this, and its some of his finest work. The music is joyous, the bamboo forest is just beautiful (01:11:18) We used bridal veil between the foreground of the set and the background to give a sense of depth and atmosphere. There's not a whole lot of space, actually, between those two things, but by using these tricks that come from the stage, really, from the theater, we're able to give a sense of depth and perspective. These shots here were really challenging, because, you know, walking a puppet is really, really hard. And our animator here, Ludo Berardo, had to animate three of them, Kubo sitting on Monkey's back, Beetle there with his captain of the football team swagger. (0:11:46) They all had to have their own unique gait."

CAR pp. 207-08. This is compelling evidence of plaintiff's extraordinary achievements and his renown as the walk animator. Defendants did not acknowledge or discuss this written transcript of the video, which included the film's Director's comments about Plaintiff's work in Denial II, nor, of course did they view the video either.

Plaintiff submitted screen shots with accompanying text description of the video evidence labeled EXH 18, which was the hour-long PAM panel discussion, and included a transcript of the LAIKA Sunday panel at PAM held on May 18, 2018, featuring Mr. Berardo alongside the producer and director. CAR pp. 233-244. The transcript included time references to the video footage. Defendants did not acknowledge or discuss these screen shots, text descriptions, or transcripts of the video showing Plaintiff presenting his work at the PAM exhibition. In refusing to view video evidence which was submitted by Plaintiff to meet his burden of proof, and in refusing to discuss the screen shots, text descriptions, and transcribed sections, defendants acted in an arbitrary and capricious manner.

When evaluating the final merits, Defendants discounted the importance of Plaintiff's display of his work at artistic exhibitions, stating that the exhibitions "may have involved the self-petitioner's work" but that "the focus of the exhibitions was really LAIKA and not the self-

petitioner." Denial II, p. 15, CAR p. 15. Defendants failed to discuss or consider the fact that plaintiff represented the entire LAIKA studio in France at the Fête de l'anim' festival, out of a cast of hundreds, and that he was the only stop-motion animator to speak at the panel discussion at the exhibition at PAM, and because defendants did not review the video evidence did not consider that he exhibited to the audience how he animated the puppets for the movies. Defendants failed to consider important evidence, refused to review relevant and probative evidence admissible under the Federal Rules of Evidence, and entirely failed to consider the totality of the evidence regarding plaintiff's display of his work at artistic exhibitions, resulting in failure to consider an important aspect of the problem.

**D.    8 C.F.R. § 204.5(h)(3)(viii) (leading or critical role for distinguished organization)**

Defendants found that plaintiff, one of the leading stop-motion animators at one of the most prestigious stop-motion animation studios in the world, failed to show evidence that he performed in a leading or critical role for an organization or establishment with a distinguished reputation as outlined in the criterion at 8 C.F.R. § 204.5(h)(3)(viii). CAR pp. 7-10.

LAIKA is an organization with a distinguished reputation, which produces stop-motion feature films that have been nominated for Academy Awards. LAIKA cannot produce stop-motion animated feature films which garner Academy Award nominations without stop-motion animators who are at the top of their field. Each of the 12 to 28 stop-motion animators employed by LAIKA on its many shooting units, numbering between 71 and 105 units, is critical to LAIKA. Plaintiff submitted evidence in the form of a 13-page letter from Mr. Brad Schiff, Animation Supervisor. CAR pp. 114-26. Plaintiff submitted a 4-page letter from Arianne Sutner, Head of Production at LAIKA, attesting to Plaintiff's critical and leading role for LAIKA. CAR

pp. 110-13. Defendant characterized the Schiff and Sutner letters as attesting to Plaintiff as a "diligent employee" and "a valuable employee" and "simply good at their job." Denial II, pp. 7-10, CAR pp. 7-10. Defendants characterization of the letters from Mr. Schiff and Ms. Sutner represent a clear error in judgment. Defendants' statements are so divorced from the reality of the facts set out in the Schiff and Sutner letters that it defies explanation. It cannot be ascribed to a difference of opinion. A casual reading of the Schiff and Sutner letters, let alone a searching and careful review, readily yields an entirely different conclusion – that Plaintiff has served in a critical and/or leading role (either type of role qualifies under the regulations) for an organization with a distinguished reputation. Defendants conclusion that plaintiff has not met the criterion at 8 C.F.R. § 204.5(h)(3)(viii) is arbitrary and capricious, was not based on a consideration of the relevant factors and runs counter to the evidence before the agency.

Defendants failed to consider the *Animation Magazine* article, "Anja Poland & Ludovic Berardo on the Creative Craft of LAIKA Magic," as independent, corroborating evidence of Plaintiff's critical role for LAIKA, wherein it describes him as the renowned "walk animator"[3] capable of walking puppets in a lifelike way unlike any other animator. The article reads,

> "Since 2005, the internationally acclaimed studio LAIKA has been reinvigorating the stop-motion animated feature landscape in the US and around the world. The Portland, Oregon outfit has delivered four award-winning, Oscar-nominated films – *Coraline* (2009), *ParaNorman* (2012), *The Boxtrolls* (2014), and *Kubo and the Two Strings* (2016) – and has recently revealed its fifth project, *Missing Link*, coming in 2019. And with each title, studio head Travis Knight and his team of talented artists, craftspeople and technical whizzes have pushed the envelope in what the stop-motion medium can deliver with ever more ambitious blends of old-school skills and cutting edge technology. This month, Animation Magazine was lucky to talk to two of these crucial team members – costumer Anja Poland and animator Ludovic Berardo – to learn more about how creativity and innovation

---

[3] References in the evidence include "walk animator" and "walking animator" and refer to the same extraordinary ability for which plaintiff is renowned.

combine to make LAIKA movie magic…

Poetry in Motion

Originally from Belgium, Berardo first set out to follow his passion for illustration and comic books at ESA Saint-Luc Liège, before a friend turned him on to animation. He graduated and went on to the experimental animation program at ENSAV-La Cambre in Brussels with a focus on 2D – then another friend got him into stop-motion. After working on movies and shows around Europe, he joined LAIKA six years ago on the crew of ParaNorman.

'In 2D, there's no limit to your imagination, but it exists only in two dimensions. And that's what I love so much about stop motion. I can touch my characters; move them around in their world, but in my dimension,' says Berardo. 'And, I like to feel like a giant giving life to these beautiful puppets.'

Berardo explains that with all the hands-on attention required for stop-motion, assigning scenes at LAIKA is a bit like casting actors for a movie — each animator's personality, skillset and vision for a character or moment affects their work. 'Some animators are good at comedy scenes, some are better with action scenes, or emotional [scenes]. Therefore, we are assigned shots that best reflect our personality,' he notes. 'But I would say that mostly we are versatile.'

On Kubo, for instance, Berardo became known as the 'walk animator.' 'I'm apparently good at it. Maybe because I'm tenacious. Walking a puppet is one of the most difficult and painful things to animate,' he says. 'And still to this day I'm often taken off my sequence to do a walking shot here and there.'

This rep was built by his work on a sequence in which Kubo, Monkey and Beetle are walking through the forest, across uneven ground. This seemingly simple promenade took more than six months to complete and was, Berardo says, 'the most challenging thing I've ever done.'"

CAR pp. 408-09. The Denial II fails entirely to acknowledge Plaintiff's renown as the "walk animator" whether from the *Animation Magazine* feature article, from Mr. Schiff's letter, Ms. Sutner's letter, from the director Travis Knight commentary during the making of video (with transcript) about the iconic walking scene of Monkey, Beetle and Kubo in Kubo and the Two Strings. Nowhere in Denial II is any mention of plaintiff's "walk animator" renown or the reference to walking puppets at all. Defendants failed to consider important aspects of the

AMENDED MOTION FOR SUMMARY JUDGMENT                                    – Page 15

problem, namely walking puppets is very, very difficult, even for the most skilled, renowned stop-motion animators, and that plaintiff is highly renowned for this unique skill. Mr. Schiff's letter states,

> "Most elite animators like Ludovic have a specialized skill set. Ludovic is renowned as the walking animator. There is literally no one on the planet who can walk a puppet as naturally as Ludovic…"

> The rare ability to both naturally walk a puppet and breathe life and emotion into LAIKA's films is truly indispensable. No one else in the world can contribute this specific combination of skills to our studio with such consistency, regardless of the type of scene or character. He is one of the only stop-motion animators on our team that has animated key scenes with all our hero characters."

CAR pp. 115-16. Defendants wholly failed to consider or discuss Plaintiff's renown as the "walking animator." Defendants Denial II discounts Plaintiff's leading and/or critical role by stating,

> "However, Mr. Schiff seems to be the one with the leading or critical role at LAIKA as it is Mr. Schiff who has the title, Animation Supervisor, and has been nominated for an Oscar and won an Emmy for animation. Although Mr. Schiff states he has made the self-petitioner 'one of [his] character leads for two particular characters in the movie, The Boxtrolls, it appears from the credits for The Boxtrolls listed on IMDb that the self-petitioner was one of approximately 60 people who were listed as some type of animator. It is also noted that IMDb simply credits the self-petitioner as an "animator" rather than a lead animator and the credits include other titles such as lead animators (3 people); Key Assistant Animator; CG animator, additional animator, effects animator, CG facial animator, CG rapid prototype animator; 2-D facial animator, stop-motion animator; assistant animator."

CAR pp. 7-8. Denial II fails to discuss or consider, however, Mr. Schiff's letter in which he responds to this criticism, first voiced in the NOID:

> "I have reviewed the Notice of Intent to Deny (NOID) issued by USCIS and dated December 20, 2019. On page 5 of the NOID, USCIS notes that 'the evidence does not establish that the self-petitioner had a leading or critical role for any of the organizations claimed…' I strongly disagree with this statement. The NOID seems to identify me, as Animation Supervisor, as the only leading or critical individual in all of LAIKA in connection with our feature length stop-motion

AMENDED MOTION FOR SUMMARY JUDGMENT                    – Page 16

films. The animators with titles such as supervisor or lead are among our most critical and leading contributors, but those individuals (including myself) are tasked with staff management responsibilities which preclude animating as extensively as actors of these puppets in our films. Ludovic as an animator has served as character lead, which is the same as a leading actor in a live action film. The fact that he does not have the lead animator title does not mean that his role is not leading, or critical. It denotes that he works as an animator instead of a manager, but as I explained in detail above, he has animated critical scenes in our movies for leading characters, which in our industry is a leading role. He's acting a leading role. His work is also a critical one because without these amazing scenes of our leading characters, we cannot win awards and cannot fill seats at the theaters which directly relates to our bottom line and our distinguished reputation."

CAR p. 119. This testimony was completely ignored. Mr. Schiff's letter also explained:

"The work of digital animators (such as 2D (two dimensional) and CG (computer graphics)) is fundamentally different from that of stop-motion animators. And whereas it is incredibly difficult to recruit and hire qualified stop-motion animators, computer/digital animators are comparatively dime-a-dozen.

Regarding other types of animators on our productions, facial animators work within the rapid prototype department. Their responsibilities include creating rough animation and preparing facial performances for the stage, all to be approved by stop-motion animators and members of the production's management, including the director and myself. Facial animators take direction from stop-motion animators, the director, the animation supervisor, and me. Facial animators also work with stop-motion animators and the facial animation supervisor to ensure that all shots are delivered and revised efficiently. Other facial animator tasks include testing of faces for the rapid prototype department, preparing exposure sheets and quick-times for animators and the editorial department, and identifying upcoming shots that may require custom faces. Variations on this title can include 2-D facial animator and CG rapid prototype animator. This role is not comparable to that of the stop-motion animators, and much of the responsibilities of this role are done to support the performances of Ludovic and the other stop-motion animators.

CG animators create the performance of computer graphics characters and objects within a shot and fall within the visual effects department. CG animators take creative direction from stop-motion animators, the director, and me to ensure the highest quality of animation possible. Their other responsibilities include creating digital animation that integrates with the look and feel of the stop-motion animation performances, and they animate props and effects elements. Variations on this title can include effects animator. Again, the scope of this role is not comparable to the work that Ludovic performs as one of our lead and critical stop-

AMENDED MOTION FOR SUMMARY JUDGMENT                    – Page 17

> motion animators, and much of the work of the CG animators is done in support of the stop-motion animators' performances. We are a stop-motion first company. The role of stop-motion animator is that of an actor, not a makeup artist or other supporting role. In the same way that a makeup artist or costume artist supports an actor in a live action film, these other types of animators all play support roles to the leading role of a stop-motion animator. Further, because Ludo is widely regarded in the field as one of the top stop-motion animators in the world, he is tasked with animating (acting) leading roles for our leading characters, for pivotal, critical scenes."

CAR 120-21. This detailed rebuttal of the suggestion first voiced in the NOID and again repeated in Denial II that Plaintiff was just another of the 60 people listed as some kind of animator, was not discussed or considered by Defendants in Denial II. Mr. Schiff's letter explains that Plaintiff is one of only 11 stop-motion animators at LAIKA who currently holds a "studio designation" on a team with as many as 31 stop-motion animators, and that being a "studio employee means being perpetually on payroll, a full-time permanent position, rather than project work" and that out of 271 employees currently on production at the time of his letter, only 43 were studio employees. CAR p. 121. Denial II failed to discuss the studio designation. Defendants consideration of Mr. Schiff's letter can only be described as one which runs contrary to the evidence contained in that letter.

Defendants also failed to consider relevant factors when dismissing Ms. Sutner's statement that Plaintiff was the third fastest animator out of a team of 28, as not indicative of a critical role for LAIKA. Ms. Sutner's letter explains how maintaining a high level of performance at a fast rate directly results in the movie being finished on schedule, which directly translates into critical contributions to LAIKA. CAR p. 113.

In summary, defendants failed to recognize plaintiff's leading or critical role at LAIKA because they ignored, disregarded, and mischaracterized evidence to the point of unreasonableness.

### E.    8 C.F.R. § 204.5(h)(3)(ix) (high salary)

Defendants found that plaintiff failed to show evidence that he has commanded a high

salary as compared to others in the field as outlined in the criterion at 8 C.F.R. § 204.5(h)(3)(ix).

CAR p. 10. The evidence regarding Plaintiff's salary showed $128,408 in remuneration in 2018

and a salary of $120,386 as documented by Plaintiff's IRS Forms W-2 for these years. CAR pp.

714-724.

Defendants admitted that Plaintiff "appears to have a high salary for the Portland, Oregon

area" in the Denial II. CAR p. 10. Defendants' own Adjudicator's Field Manual ("AFM")

outlines the internal standards for adjudicating evidence of high salary, stating that,

> "Evidence regarding whether the alien's compensation is high relative to that of
> others working in the field may take many forms. If the petitioner is claiming to
> meet this criterion, then the burden is on the petitioner to provide appropriate
> evidence. Examples may include, but are not limited to, *geographical* or position-
> appropriate compensation surveys and organizational justifications to pay above
> the compensation data." (emphasis supplied)

See AFM Chapter 22, 22.2(i)(1)(A) (Employment-based Immigrant Visa Petitions; Special

Considerations Relating to EB-1 Cases; E11 Aliens with Extraordinary Ability; Evaluating

Evidence Submitted in Support of a Petition for an Alien of Extraordinary Ability). Defendants

own guidance thus includes "geographical" appropriate compensation surveys as appropriate

evidence and defendants' Request for Evidence (RFE) issued in this case on June 11, 2019 notes

as acceptable evidence "*geographical* or position appropriate compensation surveys." RFE p. 5,

CAR p. 520 (emphasis supplied). The Portland, Oregon area is the geographical area where

Plaintiff's employer LAIKA is located and yet defendants disregarded probative geographical

evidence relating to salary. Plaintiff should not be prejudiced because he is not employed in the

highest paying area in the country. Upholding such a limitation would confine successful

applicants to only the most highly paid pockets of the country, a result that is arbitrary.

In a response to the RFE submitted August 26, 2019 Plaintiff submitted a geographical appropriate wage survey from Glassdoor for the Portland area showing average base pay for animators at $77,318 per year, with a high of $106,000, a geographical appropriate wage survey from Ziprecruiter for the Portland area showing average base pay for animators at $63,411 per year, with a high of $110,314, a geographical appropriate wage survey from LinkedIn for the Portland area showing average base pay for animators at $63,800 per year, with a high of $103,000. CAR p. 725-27. In that LinkedIn salary survey, however, at the bottom, was a link to another survey showing "Top paying locations for Animator" where it noted that for the "Greater Seattle Area" with 21 salaries reported, that the median base salary was $80,000 per year with a high of $140,000. CAR p. 727. Plaintiffs did not submit a Seattle-area survey as a geographically appropriate survey, but rather the Portland-area survey submitted included on the bottom of the web printout the top paying location in the country with the top salary in that geographical location (Seattle). Defendants, however, latched on that $140,000 Seattle-area wage in the NOID and again in Denial II, discussing in detail the highest figure from the highest paying geographical region. CAR pp. 40-41; CAR p. 11. Plaintiff submitted evidence in response to the NOID that the cost of living in Seattle was 49% higher than the national average, while the cost of living in the Portland area is 29% higher than the national average, as evidence that the top geographic area wage of $140,000 was comparable to Plaintiff's wage of over $120,000 (Seattle's cost of living is 20% higher than Portland). CAR pp. 142-52. Plaintiff submitted evidence in response to the NOID from the Council for Community and Economic Research, showing "The Ten Most and Least Expensive Urban Areas in the Cost of Living Index (COLI)" which ranked Seattle, Washington as number 6 on the most expensive geographic areas in the

AMENDED MOTION FOR SUMMARY JUDGMENT                          – Page 20

country, and did not list Portland, Oregon on that list. CAR 152-53. The report states that the" Cost of Living Index measures regional differences in the cost of consumer goods and services excluding taxes and non-consumer expenditures, for professional and managerial households in the top income quintile. It is based on more than 50,000 prices covering almost 60 different items for which prices are collected three times a year by chambers of commerce, economic development organizations, or university applied economic centers in each participating urban area." The Cost of Living Index for a geographic area is an important factor in determining wages paid by employers.

Defendant recounted this evidence in Denial II, but did not address the geographic disparity or cost of living impact on the survey data, other than to say "the salary or remuneration should be high in relation to others in his field, regardless of their location. More useful evidence would show that the self-petitioner's salary is high in relation to all animators." CAR p. 11. Defendant failed to consider an important aspect of the problem by disregarding geographically appropriate salary data and probative evidence regarding the difference in cost of living between Seattle and Portland areas.

In response to the NOID, Plaintiff submitted nationwide salary data from Ziprecruiter showing the national average for animator salaries at $66,218 per year with a high of $93,000 and submitted nationwide salary data from PayScale showing the national average for animator salaries at $51,860 per year with a high of $84,000 as well as nationwide salary data from Glassdoor showing the national average for animator salaries at $67,446 per year with a high of $98,000. CAR pp. 127-131. Plaintiff also submitted U.S. Department of Labor, Bureau of Labor Statistics, Occupational Employment Statistics, from May 2018 corresponding to Plaintiff's wage data documented for 2018 and available as of the time of the petition filing in April 2019

AMENDED MOTION FOR SUMMARY JUDGMENT                                – Page 21

showing nationwide salary data for animators, reflecting a national median wage of $72,520 per year, a 75th percentile wage of $97,100 per year, and a 90th percentile wage of $124,310 per year. CAR pp. 155-61. Defendants did not discuss this submitted data in Denial II.

Defendants instead noted that there was "newer information" last modified March 31, 2020, admitting "so this was after the self-petitioner responded to the NOID" (CAR p. 11) showing that the BLS statistics from May 2019 shows multimedia artists and animators in the 90th percentile earned an annual wage of $139,000, noting that this "new" salary information shows that Plaintiff's 2017 and 2018 wage would not fall within the top 10% of the newly published rates. The BLS statistics relied upon by Defendants to reach this conclusion did not exist at the time Plaintiff filed the petition (April 2019), nor at the time Plaintiff submitted his response to the NOID (February 2020). The data itself includes figures created after the filing of the petition and submission of salary evidence, and the survey itself was published after the deadline for all evidence plaintiff was allowed to submit. The "new" survey is not even part of the Certified Administrative Record, except by reference in Denial II. While defendant has relied on this new evidence, available only after plaintiff completed his submission of evidence, defendants will not now consider plaintiff's current salary of $135,774 because as a general rule USCIS considers only evidence in existence at the time of the petition filing, in this case April 6, 2019. See 8 C.F.R. § 103.2(b)(1). This is unreasonable and unfair, and arbitrary and capricious.

Defendants based the conclusion that plaintiff has not commanded a high salary in relation to others in the field upon the $140,000 figure cited by LinkedIn as the top national salary, and one found in Seattle out of 21 responses along with the newly published (and not available to plaintiff at the time of response deadlines) BLS data showing the top 10% of wages nationally to be $139,000. Defendants did not discuss or consider the weight of the other salary

AMENDED MOTION FOR SUMMARY JUDGMENT                                    – Page 22

surveys, both geographically specific and national level, indicating a range of salaries all well below plaintiff's salary. Defendants relied upon new evidence not available at the time plaintiff responded and now plaintiff has no opportunity to submit evidence of his new salary of $135,774. This was arbitrary and capricious and an abuse of discretion.

Defendants' RFE issued June 11, 2019 contained this note: "Note: U.S. Department of Labor's prevailing wage rate information alone does not generally establish whether the salary or other remuneration is significantly higher than that of others in the field. If U.S. Department of Labor's prevailing wage rate information is submitted, it should be accompanied by other corroborative evidence that the wage is high relative to others working in the field." Defendants heavy reliance on the U.S. Department of Labor's prevailing wage rate information and their disregard of the other salary data is contrary to Defendants own statements in the RFE that U.S. DOL's prevailing wage rate information does not generally establish whether the salary or other remuneration is significantly higher than that of others in the field. Defendants have failed to consider important aspects of the problem by relying on the minority of data supporting their position, disregarding substantial evidence going against their position, and have not based the decision on a consideration of the relevant factors when ignoring geographically appropriate survey data.

Defendants also appear to require that plaintiff show that his salary was higher than the highest national salary anywhere, which is not what the regulations require. The regulations require "[e]vidence that the alien has commanded *a high salary* or other significantly high remuneration for services, in relation to others in the field." 8 C.F.R. § 204.5(h)(3)(ix). (emphasis supplied). See also *Eguchi v. Kelly*, 3:16-cv-1286-D (N.D. Texas 2017) (unpublished decision finding USCIS erred in comparing Eguchi's salary to only the top 3 highest earners and

not the rest of the field); *Muni v. INS*, 891 F.Supp. 440 (N.D. Ill. 1995) (Finding agency did not adequately address the evidence of salary where evidence showed Muni made more than the average in his field). The regulations appear to have different standards between "salary" and "remuneration" since one uses the adjective "high" (salary) and the other "significantly high" (other remuneration). Defendants never considered the fact that plaintiff is a studio employee on perpetual salary, unlike the vast majority of animators in the industry, and thus a high salary should be considered high in relation to others when it is somewhere less than the absolute highest level wage reported, but still "high" in relation to others. Defendants failed to consider any of this in the Denial II, which was arbitrary and capricious.

F.      8 C.F.R. § 204.5(h)(3)(x) (evidence of commercial success)

Defendants found that evidence of commercial success under 8 C.F.R. § 204.5(h)(3)(x) had been met, but that "it is not credible to attribute the success of the films specifically to the self-petitioner." CAR p. 15. Plaintiff submitted a letter from Arianne Sutner, Head of Production at LAIKA, who stated that, "Ludovic was one of our top six fastest animators on *Kubo*, producing an impressive 3.7 seconds of footage per week on average. It took an imposing six months for Ludovic to animate the bamboo forest scene due to its complexity. The scene was later used for promotional materials for the film, including trailers, which we strongly believe contributed directly to the commercial success of both the film and the studio." CAR p. 111. Defendants did not mention this statement in its discussion in the final merits section of Denial II. Plaintiff submitted video evidence as well as screen shots of the movie trailers and promotional materials for the movie *Kubo and the Two Strings.* Defendants did not mention this evidence in its discussion in the final merits section of Denial II. Defendants failed to consider an important aspect of the problem, and the final merits analysis of Denial II was not based on a

consideration of the relevant factors.

### III.    Final Merits analysis

The Ninth Circuit has stated that after USCIS has determined at least three types of qualifying evidence have been submitted, USCIS then undertakes a "final merits determination of whether a petitioner is at the very top of his or her field of endeavor". *Kazarian v. USCIS*, 596 F.3d 1115, 1121 (9th Cir. 2010). USCIS has adopted this two-part adjudication standard. See Adjudicator's Field Manual ("AFM"), Chapter 22, 22.2(i)(1)(A). See also *Rijal v. USCIS*, 772 F.Supp.2d 1339, 1346-47 (W.D. Wa. 2011) (finding USCIS wrongly discounted evidence in the first part of the analysis because it was during a limited period of time and because the work was not displayed more prominently than others in the competitions).

Having determined that plaintiff did not meet the "high salary" or "lead or critical role for organization of distinguished reputation" evidentiary criteria, defendants abandoned any discussion of this evidence during the final merits determination. This was error. The agency's own Administrative Appeals Office (AAO) has found in a non-precedent decision that when the agency reaches the final merits determination it must evaluate the totality of the evidence, including evidence which the agency determined did not meet the criteria. *In Re: 1852444* (AAO Dec. 5, 2019).[4] When evaluating the totality of the evidence, the agency is required to "examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made." *State Farm Mut. Auto Ins. Co.*, 463 U.S. at 43. Here, the agency did not discuss vast aspects of the evidence, and therefore failed to consider important aspects of the problem and failed to articulate a satisfactory explanation,

---

[4] The vast majority of AAO opinions are non-precedent.

which is grounds for finding the agency acted arbitrarily under the APA.

Defendants failed to discuss plaintiff's high salary in relation to others at all during the final merits determination. They previously admitted his salary was high for the Portland area where he is employed, and only pointed to two salary sources of the highest salaries from other geographic regions of the country that were slightly higher (about 9%) than plaintiff's salary, and failed to discuss the significance of cost of living differences between the salaries which plaintiff claimed was significant (20% higher cost of living, much more than the 9% difference in salary). Unless a field of endeavor is unmoored from a geographic location where the work is done (such as a professional golfer competing in national competitions), geographic differences as discussed in the agency's own guidance are relevant to a determination of whether a salary is high in relation to others in the field. Animators work in studios in a specific geographic location. The agency may not ignore such geographic differences where plaintiff presented complete geographic data for review. Otherwise, self-petitioners in high paying areas with less renown than petitioners in less high paying areas would have advantage, an arbitrary result. None of the other salary surveys submitted by plaintiff was discussed, and the DOL salary data available at the time of the filing, supporting plaintiff's claim, was downplayed in favor of later issued DOL salary data not even available at the time plaintiff was required to submit evidence, and only presented for the first time in the Denial II. This was capricious.

Defendants failed to discuss plaintiff's leading and critical role for LAIKA during the final merits determination. The differences between the testimonials and news articles describing plaintiff's leading and critical roles for LAIKA on the one hand and defendants' characterization of his roles on the other, there is no accounting for it. Defendants have rather blatantly mischaracterized his role at LAIKA, failed to recognize that he has shown his role was either

AMENDED MOTION FOR SUMMARY JUDGMENT                                    – Page 26

leading or critical to LAIKA, and failed to even mention it in the discussion of the final merits.

This was an error which greatly prejudiced plaintiff. Below is a comparison of what the

testimonials stated and how the defendants' characterized the testimony:

| Schiff's Letter | Defendants' characterization |
| --- | --- |
| One of the world's few elite, high achieving animators | [A] talented animator |
| [h]is performances are some of the best examples of stop-motion acting the world has ever seen | |
| [O]ne of the most exceptionally gifted stop-motion animators I have ever encountered | |
| [R]enowned as the walking animator. There is literally no one on the planet who can walk a puppet as naturally as Ludovic | [No mention of walk animator] |
| Less than a handful of animators I have ever known could get this scene right…left both the directors and me speechless | [Plaintiff's] proportionate claim to the films' success is not readily apparent |
| [P]erformed some of the most memorable scenes in *The Boxtrolls* | |
| On *Kubo and the Two Strings* (2016), I utilized Ludovic As the lead on one of our most important and complex sequences | [S]imply one of many animators who play a role in the creation of LAIKA's successful films |
| He is not merely one of a "cast and crew of many" but rather our cast and crew of many work to support his extraordinary work as a leading actor of animated puppets | [P]art of a case and crew of many |
| [O]ne of the most incredible animation performances I have ever seen | |
| [P]erfect example of the world class versatility of his acting abilities | |
| Ludovic's significant contributions to the film helped LAIKA secure our first ever Golden Globe win for Best Animated Feature Film | [M]ore akin to examples of someone who is simply good at their job |
| [B]ecause Ludo is widely regarded in the field as one of the top stop-motion animators in the world, he is tasked with animating (acting) leading roles for our leading characters, for pivotal, critical scenes | [V]aluable employee [because he is] simply doing his job at LAIKA |
| [O]ne of the most extraordinary animators working in the field today | |
| Ludovic is without a doubt one of the world's few elite stop-motion animators that has risen to the top of his field | [A] diligent employee |
| His performances have become touchstones in the | [A] skilled and valuable employee |

creative and technical evolution of stop-motion animation, and his work redefines what is possible with the medium

**Sutner's Letter**

| | |
|---|---|
| Ludovic is our only stop-motion animator on a team of as many as thirty, who can "walk" a puppet as effectively as we need so that the puppet's gait and movement appear totally smooth and natural on screen, while at the same time breathe life into multiple unique characters and do so quickly. | [A] skilled and valuable employee |
| [T]op six fastest animators on *Kubo*…the third most productive animator out of a team of 28… It was thanks in part to his significant contributions as an extremely high caliber stop-motion animator that the shoot for *Missing Link* did not extend even further than it already had to. | Being the third fastest animator on a team of 28 does not rise to the level of a leading or critical role for an organization. |
| Ludo is special in that in every film, including our latest, he has animated critical scenes <u>with all of our hero characters</u>…For the audience, that's like inviting a super-athlete who's been to five Super Bowls and won each time. | [S]omeone who is simply good at their job. |

Schiff's letter: CAR 114-126; Sutner's letter: CAR pp. 110-113; Denial II: CAR pp. 7-10. A reasonable review of both documents side by side will yield the conclusion that plaintiff's evidence was grossly mischaracterized, and the divergence cannot be ascribed to a difference of opinion.

There is also error in the way that defendants have determined whether plaintiff has shown his acclaim is "sustained." Defendants only credited plaintiff with one of the publications submitted, finding that the others were not "about" him. Thus, defendants claim, his acclaim is not sustained due to only having one article. Aside from the fact that defendants erred in finding the other articles were not about him, the determination of "sustained" acclaim must take into

AMENDED MOTION FOR SUMMARY JUDGMENT                    – Page 28

consideration the totality of the evidence, not just each criterion in a vacuum. Here plaintiff has contributed to the field of animation at a high level during a career spanning many years, and in many of those years he has held critical and or leading roles on multiple movies for LAIKA, all of which have received nominations for Best Animated Film by the Academy Awards, and all of which spanned several years in the making (sustained from 2012 to 2019 when the petition was filed). His high salary is a studio employee salary, not project based or temporary, sustained over a period of years. Defendants avoided discussing the sustained nature of his roles on LAIKA's distinguished films. Defendants also point to the exhibitions which took place in October 2017 and December 2018, for their position that the 14 months between these exhibitions does not show sustained national or international acclaim. This is another example of defendants' application of the "sustained" standard to each individual factor, and not to the totality of the evidence. The term "sustained" means "maintained at length without interruption, weakening, or losing in power or quality." Webster's Third New Int'l Dictionary 2304 (unabridged ed 2002). The totality of plaintiff's evidence shows sustained acclaim, and defendants' attempt to point to one factor here and another there to show the closeness in time between two events making up part of the whole fails to account for the sustained nature of the entire body of evidence. Plaintiff's acclaim cannot be said to reflect a "weakening or losing in power or quality." Rather, it shows a strengthening of his renown at length without interruption, beginning with the acclaim he enjoyed in Europe prior to coming to LAIKA in 2012 where his reputation preceded him, and continuing on four feature-length films which each took more than two years each to animate and each received a nomination for Best Animated Feature Film at the Academy Awards, and continuing through prestigious animation industry publications about him and film festival judging. Defendants' discussion of "sustained" acclaim is confined to stating there is only one

article in a major industry publication about him and that he only served as a judge at two international film festivals in two years. This inaccurately reflects the overall sustained nature of the acclaim he has garnered over his career which began in Europe with the distinguished Aardman Animation and culminated with his present longstanding studio employee position at LAIKA over four Academy Award nominated feature films.

Defendants denigrated plaintiff's two-time service as a juror at prestigious animation festivals in Canada and the United States using standards for "reviewing material for scientific journals" as the basis. This was error. Plaintiff submitted a detailed letter from an expert in the field, Mr. Schiff, who attested that

> "[o]f LAIKA's leading stop-motion animators, very few have had the opportunity to participate as a juror of stop-motion films. That Ludovic was invited to do so for Stop Motion Montreal is a testament to his international renown and the acclaim he enjoys as one of the world's elite stop-motion animators…Again, few of our leading stop-motion animators have the opportunity to participate as a juror in our field even one time. That Ludovic was selected for this role twice speaks to his reputation as an elite stop-motion animator…I can state, as an expert in the field of stop-motion animation, that being invited even once to serve as a juror in a major film festival is evidence of a stop-motion animator having risen to the top of the field and enjoying sustained national or international acclaim.

See Letter, Schiff, CAR p. 123. Defendants preferred to use their own anecdotal experience with unrelated fields of scientific research to determine that two instances of jury participation judging films in international film festivals was not evidence of an animator rising to the top of the field, over an expert in the field of animation whose specific testimony contradicted this presumption. This was arbitrary and capricious.

With respect to evidence of display of plaintiff's work at artistic exhibitions, defendants claim that the focus of the exhibitions was "really LAIKA and not the self-petitioner" and that "such a display is not on par with a visual artist whose work is the subject of a solo exhibition."

AMENDED MOTION FOR SUMMARY JUDGMENT                              – Page 30

CAR p. 15. This conclusion fails to consider important aspects of the problem as explained below. Plaintiff should not be compared to a visual artist who is exhibiting his or her own work, and not associated with a distinguished organization such as LAIKA. There must be some standard which recognizes the substantial participation toward the work of an exhibition which displays the work of many people, or else critical contributors of large and distinguished companies such as LAIKA, Pixar, and Disney have no way of competing against a much smaller solo show. Extensive evidence was submitted that plaintiff, in addition to his distinguished employer LAIKA, was featured or highlighted in some ways more than others at LAIKA in those exhibitions. For example, at the Portland Art Museum Exhibition, testimonial, documentary and video evidence was submitted showing that plaintiff was up on a stage with the film's Director and Head of Production explaining to an audience complete with actual puppets from the movies how he animated them. CAR p. 233-48. Evidence was submitted that his key sequences in films were used in promotional materials. CAR p. 213-20; 189-96. Evidence was submitted in the form of exhibition promotional materials, the article in *Variety* magazine, and testimonial evidence that he was LAIKA's designated representative at the exhibitions held in France at Fête de l'anim' where multiple LAIKA movies were displayed, all but one of which plaintiff animated key characters. CAR pp. 170-75; CAR pp. 628-39. He explained his work on the films and he taught a masterclass as well at the exhibition in France. While he was admittedly not the sole focus of the exhibition, such as would be the case for a solo exhibition, his work was at least a focus of the exhibitions, and his work was undeniably exhibited there. Failing to consider the featuring of plaintiff as a representative of the organization in connection with these exhibitions was error, in that it failed to consider an important aspect of the problem.

Likewise, defendants dismissed plaintiff's contributions toward the commercial success

AMENDED MOTION FOR SUMMARY JUDGMENT                                    – Page 31

of LAIKA's motion pictures stating that he was just a part of the cast of many. This position ignores the extensive evidence that plaintiff's animation of key scenes in the movies was used in promotional videos and movie trailers. Denial II mentions that the "box office draw of the celebrities" who voiced the lead characters that plaintiff animated were more important, but in doing so ignores the "box office draw" of the sequences that plaintiff animated as movie trailers (which defendants didn't review because it was in video form) and the role that movie trailers and promotional materials play in getting people in to see the movies. It ignores the testimony of Mr. Schiff and Ms. Sutner who explain in detail plaintiff's extraordinary contributions to the movies and promotional materials, and animation of key sequences and leading characters, and to the speed at which the movies were produced which avoided costly delays in production. Defendants' denial also ignores the specific details which were provided by Mr. Schiff regarding the roles of others at LAIKA, including a detailed breakdown of the other types of animators who support the critical role of the stop-motion animator. These important considerations were overlooked or ignored.

Note that the only circuit court decision discussing the final merits determination is *Kazarian*, but the Court in *Kazarian* never reached a review of the final merits because it found that the plaintiff in that case had only established two of the required three criteria in part one of the analysis, and could not reach the second part of the analysis. *Kazarian v. USCIS*, 596 F.3d 1115, 1121 (9th Cir. 2010). Without guideposts for the part two analysis, however, the agency has made a mockery of the final merits determination in this case. Here, defendants admit that plaintiff has shown four criteria, and plaintiff claims he has met two additional criteria, for a total of six. Should the number of regulatory met have no meaning in the final merits analysis whatsoever? The agency in promulgating regulations narrowed the criterion to just ten

enumerated areas of evidence, and plaintiff who has <u>twice</u> the required criteria is more likely to have met the regulatory criteria.

The agency's decision here was not "based on a consideration of the relevant factors" and constituted "a clear error of judgment. See *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416 (1971). The agency failed to properly apply a preponderance of the evidence standard, disregarded probative evidence, mischaracterized evidence, and abused its discretion to manufacture a denial to support its litigation position. Defendants' decision was not based on a consideration of the relevant factors, reflects a clear error of judgment and lacks a rational connection between the facts found and the choice made. The totality of the evidence shows that plaintiff is more likely than not an alien of extraordinary ability who has risen to the top of his field of stop-motion animation and defendants' decision to the contrary is an abuse of discretion.

## IV.    Conclusion

Plaintiff has not received a fair adjudication. He seeks review of Denial II before this Honorable Court to compel the agency to provide fairness to the adjudication of his extensive evidence. Given the focus and tenor of Denial II, which jumps on every potential negative to the exclusion of any positive evidence, and which reads more like a denial of guilt for the purpose of litigation, there is concern about receiving a fair adjudication before the agency. Defendants have abused discretion and acted in an arbitrary and capricious manner. The Court may remand to the agency for an adjudication in accordance with specific findings and instructions.

But this is not the only recourse available. The Court may determine that plaintiff merits approval and order the agency to approve the I-140 immigrant petition. See *Relx, Inc. v. Baran*, 397 F.Supp. 3d 41, 56 (D.D.C. 2019) (ordering USCIS to grant the plaintiff's petition and change her status); *3Q Digital, Inc., v. USCIS*, 1:19-cv-579-RCL (D.D.C. March 6, 2020)

AMENDED MOTION FOR SUMMARY JUDGMENT                                    – Page 33

(ordering USCIS to reopen and approve the plaintiff's petition). The adjudication of an I-140 immigrant petition is not discretionary. See 8 U.S.C. §1154(b) (using mandatory "shall" approve language). The Ninth Circuit has held that courts have broad discretion in determining remedies under the APA:

> "The court's decision to grant or deny injunctive or declaratory relief under APA is controlled by principles of equity. *Westlands Water Dist. v. Firebaugh Canal*, 10 F.3d 667, 673 (9th Cir. 1993); *Sierra Pacific Industries v. Lyng*, 866 F.2d 1099, 1111 (9th Cir. 1989). The district court must weigh 'the competing claims of injury…and the effect on each party of the granting or withholding of the requested relief.' *Amoco Production Co. v. Village of Gambell*, 481 U.S. 531, 542, 107 S.Ct. 1396, 1402, 94 L.Ed.2d 542 (1987)."

*Nat'l. Wildlife Fed. v. Espy*, 45 F.3d 1337, 1343 (9th Cir. 1995). The agency has already had ample adjudicatory opportunity. Defendants reviewed plaintiff's extensive initial filing, issued plaintiff a Request for Evidence, reviewed the extensive response, issued Denial I, reopened the case after the lawsuit was filed and issued a Notice of Intent to Deny, reviewed plaintiff's extensive response to the NOID and ultimately issued Denial II. Plaintiff is an individual litigant and not a corporation or well-funded organization and should not be required to endure yet another denial and costly legal challenge should the agency once again abuse its discretion and issue a third unfair decision after a remand. The administrative record is fully developed and plaintiff has shown that he is more likely than not an alien of extraordinary ability as defined by the statutes and regulations, and defendant in such circumstance has no discretion under the statute to deny the petition.

Plaintiff respectfully requests that the Court set aside the denial, find that he is eligible for the classification, and order defendants to approve the petition so that he may move on to the adjustment of status phase to seek his green card.

If the Court determines that remand is the appropriate remedy, plaintiff respectfully

requests that the Court retain jurisdiction to engage in a searching and careful review of any third

adverse decision by the agency.

DATED this 8th day of June, 2020.

PARRILLI RENISON LLC

By  /s/ *Brent W. Renison*
Brent W. Renison, OSB No. 96475
E-mail:  brent@entrylaw.com
Phone:  (503) 597-7190

CERTIFICATE OF SERVICE

I hereby certify that on June 8, 2020, I electronically filed the foregoing AMENDED MOTION FOR SUMMARY JUDGMENT with the Clerk of the Court for the District of Oregon by using the CM/ECF system, in accordance with Local Rule 5-1.  Notice of this filing will be sent out to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's CM/ECF system.


*s/ Brent W. Renison*
Brent W. Renison