IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

LUDOVIC PIERRE BERARDO,

              Plaintiff,

      v.

UNITED STATES CITIZENSHIP AND
IMMIGRATION SERVICES; and LOREN
K. MILLER, Director, USCIS Nebraska
Service Center,

              Defendants.

Case No. 3:19-cv-01796-SB

**OPINION AND ORDER**

**BECKERMAN, U.S. Magistrate Judge.**

        Plaintiff Ludovic Pierre Berardo ("Berardo") filed this action against defendants United

States Citizenship and Immigration Services ("USCIS") and USCIS Nebraska Service Center

Director Loren K. Miller ("Miller") (together, "Defendants"), alleging that Defendants violated

the Administrative Procedures Act ("APA") when they denied his petition to be classified as an

alien of extraordinary ability. The parties cross-move for summary judgment pursuant to FED. R.

CIV. P. 56(a). The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 and the

parties have consented to the jurisdiction of a U.S. Magistrate Judge pursuant to 28 U.S.C. §

636(c)(1). For the reasons discussed below, the Court grants Berardo's amended motion for

PAGE 1 – OPINION AND ORDER

summary judgment, denies Defendants' motion for summary judgment, and remands this matter

to USCIS for further proceedings consistent with this opinion.

## BACKGROUND

### I.    THE "EXTRAORDINARY ABILITY" VISA

Berardo sought classification as an alien with extraordinary ability under 8 U.S.C. §

1153(b)(1)(A). This section provides for the issuance of a visa to an alien if:

> (i)    the alien has extraordinary ability in the sciences, arts, education,
> business, or athletics which has been demonstrated by sustained
> national or international acclaim and whose achievements have
> been recognized in the field through extensive documentation,
>
> (ii)   the alien seeks to enter the United States to continue work in the
> area of extraordinary ability, and
>
> (iii)  the alien's entry into the United States will substantially benefit
> prospectively the United States.

The statute does not define "extraordinary ability," but the applicable federal regulations define

the term as "a level of expertise indicating that the individual is one of that small percentage who

have risen to the very top of the field of endeavor." 8 C.F.R. § 204.5(h)(2).

A petitioner seeking to be classified as an alien with extraordinary ability may establish

his eligibility in one of two ways. First, the petitioner may prove his eligibility with "evidence of

a one-time achievement (that is, a major, international recognized award)[.]" 8 C.F.R. §

204.5(h)(3). Alternatively, the petitioner may demonstrate that he satisfies at least three of the

following ten criteria:

> (i)    Documentation of the alien's receipt of lesser nationally or internationally
> recognized prizes or awards for excellence in the field of endeavor;
>
> (ii)   Documentation of the alien's membership in associations in the field for
> which classification is sought, which require outstanding achievements of
> their members, as judged by recognized national or international experts in
> their disciplines or fields;

(iii)  Published material about the alien in professional or major trade publications or other major media, relating to the alien's work in the field for which classification is sought. Such evidence shall include the title, date, and author of the material, and any necessary translation;

(iv)  Evidence of the alien's participation, either individually or on a panel, as a judge of the work of others in the same or an allied field of specification for which classification is sought;

(v)  Evidence of the alien's original scientific, scholarly, artistic, athletic, or business-related contributions of major significance in the field;

(vi)  Evidence of the alien's authorship of scholarly articles in the field, in professional or major trade publications or other major media;

(vii)  Evidence of the display of the alien's work in the field at artistic exhibitions or showcases;

(viii)  Evidence that the alien has performed in a leading or critical role for organizations or establishments that have a distinguished reputation;

(ix)  Evidence that the alien has commanded a high salary or other significantly high remuneration for services, in relation to others in the field; or

(x)  Evidence of commercial successes in the performing arts, as shown by box office receipts or record, cassette, compact disk, or video sales.

8 C.F.R. § 204.5(h)(3).

Satisfying three of the ten criteria is "merely an evidentiary threshold[.]" *Rijal v. U.S. Citizenship & Immigration Servs.*, 772 F. Supp. 2d 1339, 1346 (W.D. Wash. 2011), *aff'd*, 683 F.3d 1030 (9th Cir. 2012). If the petitioner satisfies the evidentiary threshold, USCIS evaluates the totality of the evidence to determine whether it demonstrates both: (1) a "level of expertise indicating that the individual is one of that small percentage who have risen to the very top of the[ir] field of endeavor," 8 C.F.R. § 204.5(h)(2), and (2) "that the alien has sustained national or international acclaim and that his or her achievements have been recognized in the field of expertise." 8 C.F.R. § 204.5(h)(3); *see also Kazarian v. U.S. Citizenship & Immigration Servs.*, 596 F.3d 1115, 1119-20 (9th Cir. 2010) (discussing the two-step process). By design, the

PAGE 3 – OPINION AND ORDER

extraordinary ability classification is "extremely restrictive." *Kazarian*, 596 F.3d at 1120 (citations omitted).

## II.    PROCEDURAL HISTORY

Berardo is a citizen and national of Belgium. (ECF No. 26-2 at 184.)[1] He is employed by the LAIKA animation studio in Hillsboro, Oregon as a stop-motion animator pursuant to an O-1 nonimmigrant visa for aliens of extraordinary achievement. (*Id.*) LAIKA is an animation studio that produces award-winning stop-motion animated feature films. (ECF No. 26-1 at 285-322; ECF No. 26-2 at 1-5.) Berardo has worked as a stop-motion animator on LAIKA's films, *ParaNorman*, *Kubo and the Two Strings*, *The Boxtrolls,* and *Missing Link.* (ECF No. 26-1 at 110; ECF No. 26-2 at 107-08.) He has been recognized in the field of stop-motion animation for his unique talent at "walking" puppets and is referred to as the "walking animator" by media sources and experts in the field. (ECF No. 26-1 at 110; ECF No. 26-2 at 214.)

On April 4, 2019, Berardo filed an I-140 visa petition seeking classification under section 203(b)(1)(A) of the Immigration and Nationality Act ("INA") as an alien of extraordinary ability. (ECF No. 26-1 at 271-79.) In support of his petition, Berardo submitted over two hundred pages of evidence documenting his work as a stop-motion animator on award-winning and nominated films and claiming eligibility under six of the ten criteria set forth in 8 C.F.R. § 204.5(h)(3).

On July 11, 2019, Defendants issued a Request for Evidence ("RFE"). (ECF No. 26-2 at 194-99.) The RFE highlighted deficiencies as to the evidence Berardo submitted and stated that he had not satisfied any of the six requirements. (*Id.*) On August 23, 2019, Berardo responded with additional evidence and legal argument. (ECF No. 26-2 at 200-06.) Two months later,

---

[1] USCIS filed the Certified Administrative Record under seal (ECF No. 26), with exhibits docketed in three parts.

USCIS denied Berardo's petition, concluding that Berardo failed to satisfy any of the ten criteria set forth at 8 C.F.R. § 204.5(h)(3). On November 7, 2019, Berardo filed this lawsuit challenging USCIS's decision under the APA. (ECF No. 1.)

After Berardo filed this lawsuit, USCIS *sua sponte* reopened Berardo's petition and vacated its original decision. (ECF No. 26-1 at 55.) On December 20, 2019, USCIS sent Berardo a Notice of Intent to Deny ("NOID"). (ECF No. 26-1 at 35.) Although Berardo had not submitted any additional evidence following USCIS's original conclusion that he had not satisfied any of the ten criteria, the NOID now stated that Berardo satisfied four of the six claimed criteria, but the evidence was insufficient to demonstrate that he had risen to the very top of his field and had sustained national or international acclaim. (ECF No. 26-1 at 35-44.)

In response to the NOID, Berardo submitted additional evidence to satisfy the additional two criteria and to prove his extraordinary ability. (ECF No. 26-1 at 57-249.) On April 3, 2020, USCIS issued a second denial of Berardo's petition. (ECF No. 26-1 at 1-17.) Berardo now seeks judicial review of the second denial under the APA.

## DISCUSSION

## I.    APA REVIEW

Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "When a party seeks review under the APA, the district court 'sits as an appellate tribunal' and the 'entire case on review is a question of law.'" *Aguilar v. Neufeld*, 3:18-cv-01793-AC, 2020 WL 3351331, at *3 (D. Or. Feb. 27, 2020) (quoting *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001)).

Agency action "must be upheld on review unless it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law.'" *San Luis & Delta-Mendota Water*

*Auth. v. Jewell*, 747 F.3d 581, 601 (9th Cir. 2014) (quoting 5 U.S.C. § 706(2)(A)). A decision is

arbitrary and capricious if the agency does not "examine the relevant data and articulate a

satisfactory explanation for its action including a rational connection between the facts found and

the choice made." *Motor Vehicles Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,

463 U.S. 29, 42-43 (1983) (citation and internal quotation marks omitted).

While the Court "may not supply a reasoned basis for the agency's action that the agency

itself has not given . . . [it] will uphold a decision of less than ideal clarity if the agency's path

may reasonably be discerned." *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419

U.S. 281, 285-86 (1974). "The agency's factual findings are reviewed for substantial evidence."

*Family Inc. v. U.S. Citizenship & Immigration Servs.*, 469 F.3d 1313, 1315 (9th Cir. 2006).

Agency action is presumed valid, *Cal. Wilderness Coal. v. U.S. Dep't of Energy*, 631 F.3d 1072,

1084 (9th Cir. 2011), and courts "will not disturb the agency's findings under this deferential

standard unless the evidence would *compel* a reasonable finder of fact to reach a contrary result."

*Family Inc.*, 469 F.3d at 1315 (citation and internal quotation marks omitted).

## II.    ANALYSIS

Berardo argues that Defendants erred by: (1) disregarding and mischaracterizing

probative evidence; (2) applying improper legal standards when interpreting 8 C.F.R. §

204.5(h)(3); and (3) failing to consider relevant factors in reaching its decision. Berardo also

argues that the evidence of record establishes that he is an alien of extraordinary ability who has

sustained national or international acclaim and risen to the top of his field. In response,

Defendants argue that USCIS properly considered each criterion and reasonably determined that

Berardo failed to prove that he is a stop-motion animator of extraordinary ability. As explained

below, the Court concludes that USCIS's decision was arbitrary and capricious, an abuse of

discretion, and contrary to law, and therefore the Court grants Berardo's motion for summary

judgment and denies Defendants' motion for summary judgment.

### A.    "High Salary" Criterion[2]

At step one, Defendants found that Berardo failed to demonstrate that he commanded a

high salary compared to other animators pursuant to 8 C.F.R. § 204.5(h)(3)(ix). (ECF No. 26-1 at

10.) Berardo argues that Defendants erred by: (1) disregarding geographical disparities with

respect to his salary data; (2) ignoring evidence that demonstrated his high salary both locally

and nationally; (3) relying on survey wage data that was not available at the time Berardo filed

his petition; and (4) heightening the evidentiary standard by comparing his salary only to the

highest national salary figure for animators. (Pl.'s Am. Mot. Summ. J. at 19-24; Pl.'s Resp. at 6-

10.) For the reasons explained below, the Court finds that USCIS's conclusion that Berardo

failed to satisfy the "High Salary" criterion was arbitrary and capricious.

### 1.    "High Salary" Evidence and USCIS's Decision

The "High Salary" criterion requires "[e]vidence that the alien has commanded a high

salary or other significantly high remuneration for services, in relation to others in the field." 8

C.F.R. § 204.5(h)(3)(ix). As evidence, Berardo submitted IRS W-2 Forms listing his 2018 salary

as $128,408 and his 2017 salary as $119,953.30. (ECF No. 26-2 at 14-15.) He also submitted a

memorandum reflecting his terms of employment at LAIKA as of May 16, 2018, reporting his

annual salary as $120,188. (ECF No. 26-2 at 6.) Berardo included his paystubs from the end of

---

[2] The Court does not address Berardo's arguments that USCIS erred by failing to attribute certain evidence to the four threshold criteria that USCIS concluded he had met, as any error in USCIS's evaluation of that evidence at the first step of its analysis is harmless based on USCIS's conclusion that Berardo satisfied those threshold criteria. *See Soni v. United States*, Civ. No. 11-2431, 2016 WL 4154137, at *4 (D.N.J. Aug. 2, 2016) (finding irrelevant the petitioner's claim that USCIS erred in failing to credit certain evidence to criterion that USCIS acknowledged was met).

January through March 2019, showing that he earned an hourly rate of $63.3750 (i.e., an annualized salary of $131,820 as of March 2019). (ECF No. 26-2 at 7-13.)

As evidence of other animators' salaries in the Portland area, Berardo submitted wage surveys from Glassdoor, ZipRecruiter, and LinkedIn. (ECF No. 26-2 at 16-18.) Those surveys reported, respectively, that animators in Portland earn an average base pay of $77,318 per year, with a high salary of $106,000; an average base pay of $63,411 per year, with a high salary of $110,314; and an average base pay of $63,800 per year, with a high salary of $103,000. (ECF No. 26-2 at 16-18.) Initially, Berardo did not submit evidence of animators' salaries outside of Portland. However, a link at the bottom of the LinkedIn survey referenced another survey titled, "Top paying locations for Animator," which noted that for the "Greater Seattle Area" the median base salary for animators was $80,000 with a high of $140,000. (ECF No. 26-2 at 18.)

In the December 20, 2019 NOID, USCIS acknowledged that Berardo "appears to have a high salary for the Portland, Oregon area," but concluded that "the salary or remuneration should be high in relation to others in his field, regardless of their location." (ECF No. 26-1 at 40.) USCIS concluded that "[i]f $140,000 is the top salary in the top-paying market for animators, then the self-petitioner's salary would not be considered 'high' in comparison." (ECF No. 26-1 at 40-41.)

In response to the NOID, Berardo submitted three additional wage surveys for animators compiled from national salary data. All three surveys demonstrated that Berardo's salary was well above the ninetieth percentile of animators' salaries nationally.[3] (ECF No. 26-1 at 128-31.)

---

[3] The surveys submitted by Berardo were generated by ZipRecruiter, PayScale, and Glassdoor and listed, respectively, the national average salary for animators as: (1) $66,218 per year, with a high salary of $93,000; (2) $51,860 per year, with the ninetieth percentile falling at $84,000; and (3) $67,446 per year, with a high salary of $98,000. (ECF No. 26-1 at 128-31.)

Berardo also submitted data from the U.S. Bureau of Labor Statistics ("BLS") dated May 2018, reflecting a national annual median wage of $72,520 for animators and a ninetieth percentile annual wage of $124,310. (ECF No. 26-1 at 155.)

Berardo also produced evidence of the cost-of-living disparities between Seattle, Washington, and Portland, Oregon, to demonstrate that Berardo's $120,000+ salary in Portland is comparable to a salary of $140,000 in Seattle. Berardo provided data from PayScale demonstrating that the cost of living in Seattle is 49% higher than the national average, while the cost of living in the Portland area is 29% above the national average.[4] (ECF No. 26-1 at 147-52.) The evidence included an article from the Council for Community and Economic Research, listing "The Ten Most and Least Expensive Urban Areas in the Cost of Living Index (COLI)." (ECF No. 26-1 at 153-54.) This article ranked Seattle as the sixth most expensive geographic area in the United States, and did not include Portland on the list. (Id.)

In its denial, USCIS found that Berardo had failed to prove he earned a high salary relative to others in his field. (ECF No. 26-1 at 11.) USCIS concluded that the national wage surveys submitted by Berardo were "inconsistent" because the three surveys listed different salary ranges, and because none of the surveys reached the $140,000 figure that was cited on the LinkedIn page. (ECF No. 26-1 at 11.) In reaching its decision, USCIS relied on BLS wage data from May 2019 that was updated a month after Berardo's final deadline for submitting evidence. (ECF No. 26-1 at 11-12.) According to USCIS's decision, the updated statistics were compiled from salary data collected in May 2019, November 2018, May 2018, November 2017, May 2017, and November 2016. (ECF No. 26-1 at 11.) The updated statistics estimated that animators

---

[4] The PayScale evidence concluded that an individual earning Berardo's salary of $128,000 in the Portland area would need to earn a salary of $147,532 in Seattle to maintain his current standard of living. (ECF No. 26-1 at 147.)

in the ninetieth percentile of national wage-earners received an annual wage of $139,000 as of

May 2019. (ECF No. 26-1 at 12.) USCIS's decision concluded:

> [T]he self-petitioner's annual salary of $119,953 in 2017, $128,408 in 2018, and
> $120,188 beginning in November 2018 through 2021 would not place him in the
> top 10% of multimedia artists and animators according to the BLS. For this reason,
> USCIS cannot conclude that the self-petitioner has commanded a high salary or
> other significantly high remuneration for services, in relation to others in the field.

(*Id.*) The BLS statistics relied upon by USCIS were not included in the administrative record nor

were they available at the time Berardo submitted evidence in response to the NOID.

## 2.   Analysis

Berardo argues that USCIS erred by relying on BLS salary data that post-dated his

petition. Courts have generally found that USCIS does not err by relying on updated versions of

BLS data that was not available to the petitioner at the time of filing. For example, in *Xiaotong

Liu v. Baran*, No. SACV 18-00376 JVS (KESx), 2018 WL 7348851, at *4 (C.D. Cal. Dec. 21,

2018), the district court found that USCIS did not err when it relied on an updated version of

BLS's Occupational Outlook Handbook ("OOH") that was not in effect at the time the petitioner

filed an H-1B visa on behalf of an employee. The court reasoned, "[s]ince [petitioner] had the

burden of establishing that [the beneficiary] remained eligible through adjudication, USCIS was

justified in relying on the newest version of the OOH to determine that [the beneficiary's]

eligibility based on a specialty occupation had not continued throughout adjudication." *Id.*; *see

also* 8 C.F.R. § 103.2(b)(1) (explaining that a petitioner "must establish that he . . . is eligible for

the requested benefit at the time of filing the benefit request and must continue to be eligible

through adjudication").

However, a different issue is presented here. In *Xiatong Liu*, USCIS relied on the OOH's

post-filing changes to a particular occupation's requirements, whereas here, USCIS compared

evidence of Berardo's pre-filing salary to the post-filing BLS salary data. (ECF No. 26-1 at 12.)

In its decision, USCIS compared BLS's May 2019 salary data to Berardo's earnings from 2017 and 2018, but did not compare it to Berardo's 2019 salary as reflected on his paystubs from January through March 2019. If USCIS relied on the May 2019 national salary data, the relevant comparator data should have been Berardo's 2019 salary of $131,820.

Berardo also argues that USCIS erred by concluding that Berardo failed to satisfy the salary criterion because his salary was less than the $140,000 salary listed for top Seattle earners and the $139,000 salary figure for top national animators. (ECF No. 26-1 at 11-12.) To satisfy eligibility under 8 C.F.R. § 204.5(h)(3)(ix), a petitioner is not required to demonstrate that he receives the highest salary in his field. *See Eguchi v. Kelly*, No. 3:16-CV-1286-D, 2017 WL 2902667, at *4 (N.D. Tex. July 7, 2017) (finding that USCIS erred when it compared the petitioner's salary with the top three wage-earners in the field to determine eligibility under the "high salary" criterion); *Grimson v. I.N.S.*, No. 94 C 5243, 1995 WL 134755, at *3 (N.D. Ill. Mar. 27, 1995) (noting that the professional hockey player petitioner's salary should not be compared to salaries of NHL superstars). Rather, the appropriate test compares the petitioner's salary with the average salary of others in the same position in the field. *See, e.g.*, *Victorov v. Barr*, No. CV 19-6948-GW-JPRX, 2020 WL 3213788, at *9 (C.D. Cal. Apr. 9, 2020) (finding appropriate a comparison between the petitioner's salary and the average salary of athletes in the same sport); *Denisov v. Wiemann*, No. 3:04-CV-0529-N, 2006 WL 8437057, at *4 (N.D. Tex. Aug. 15, 2006) (requiring the petitioner to "present evidence as to the average salary or remuneration of one in his field" to satisfy the high salary criterion); *Muni v. I.N.S.*, 891 F. Supp. 440, 444-45 (N.D. Ill. 1995) (noting that "since a few very highly paid players can skew the average salary upward, it is reasonable to assume that a player making even the average salary is making more than most other players").

Here, USCIS heightened the evidentiary standard by comparing Berardo's salary only to the highest salary figure in the top range of national wage earners. Berardo presented evidence of both the local and national average salary for animators. Berardo's 2017 salary of $119,953, his 2018 salary of $128,408, his employment contract listing an annual salary of $120,188, and his pay statements reflecting an annualized 2019 salary of $131,820 place him well above the local and national average salaries for animators as reported by ZipRecruiter, PayScale, and Glassdoor. (ECF No. 26-2 at 6-18.) In its decision, USCIS did not consider these surveys. (ECF No. 26-1 at 11.) Instead, USCIS relied solely on the top salary figure listed in the May 2019 BLS report and the top $140,000 Seattle salary. (ECF No. 26-1 at 11-12.) Because the highest national salaries are an improper basis for comparison at the preliminary evidentiary stage, the Court finds that USCIS's analysis was arbitrary and capricious. *See, e.g.*, *Muni*, 891 F. Supp. at 444-45 (finding that the petitioner satisfied the "high salary" criterion where his salary was "well above average" but "well below the top salaries").

Furthermore, by comparing Berardo's salary only to the top ten percent of earners, USCIS has conflated step one of its analysis with step two. Any comparison with the highest salary earners "might be relevant to the final merits determination of whether a petitioner is at the very top of his or her field of endeavor, [but] they are not relevant to the antecedent procedural question of whether the petitioner has provided at least three types of evidence." *Kazarian*, 596 F.3d at 1121; *see also Eguchi*, 2017 WL 2902667, at *4 (finding that USCIS "impermissibly conflate[d] its step one analysis with step two" by comparing petitioner's salary only to top earners).

Finally, USCIS erred by disregarding evidence of geographical disparities as they relate to Berardo's salary compared to top animators in the Seattle area and nationwide. The agency's

own guidance recognizes that geographic differences are relevant to a determination of whether a salary is high in relation to others in the field. *See* Memorandum, U.S. Citizenship & Immigration Servs., *Evaluation of Evidence Submitted with Certain Form I-140 Petitions; Revisions to the* Adjudicator's Field Manual (AFM), Ch. 22.2, AFM Update AD11-14 (Dec. 22, 2010) (hereinafter, "AFM Manual"), at 11 ("Evidence regarding whether the alien's compensation is high relative to that of others working in the field may take many forms. . . . Examples may include, but are not limited to, geographical or position-appropriate compensation surveys").[5]

Here, USCIS's decision relied in part on the $140,000 figure listed as the top of Seattle's high salary range while disregarding evidence demonstrating that Berardo's salary in Portland is comparable to a $140,000 salary in Seattle. USCIS ignored evidence that a higher salary in Seattle is not really "higher" when taking into account geographic cost-of-living adjustments.

For the same reason, USCIS's comparison of Berardo's Portland salary to those of animators nationwide is an apples-to-oranges comparison in this particular field. As the BLS data relied upon by USCIS clearly demonstrates, the vast majority of animators work in California and New York, as common sense might predict. *See Occupational Employment & Wages, May 2019*, U.S. Bureau of Labor Statistics, https://www.bls.gov/oes/current/oes271014.htm#(9) (last visited Oct. 20, 2020).[6] In fact, the top four markets for animators in the United States are

---

[5] *But see Strategati, LLC v. Sessions*, No. 3:18-CV-01200-H-AGS, 2019 WL 2330181, at *7 (S.D. Cal. May 31, 2019) (finding that "petitioner's attempt to use average local salary levels does not allow for an appropriate basis for comparison in determining a high salary 'in relation to others in the field'") (citation and internal quotation omitted).

[6] A reviewing court may consider extra-record material when "the agency has relied on documents not in the record." *Cachil Dehe Band of Wintun Indians of Colusa Indian Cmty. v. Zinke*, 889 F.3d 584, 600 (9th Cir. 2018). Accordingly, the Court considers the May 2019 BLS statistics upon which Defendants relied in the denial, even though the statistics were not included in the Certified Administrative Record. (*See* ECF No. 26-1 at 11.)

Los Angeles (6,470), San Francisco (2,890), New York (2,700), and Silicon Valley (1,500), four

of the highest cost of living areas in the country. *Id.* That is relevant to the question of whether

Berardo earns a high salary in his field, because the national data will necessarily skew higher

where the majority of animators work in these high cost of living areas. The very data USCIS

relies upon to discredit Berardo's salary shows that the average mean salary earned by animators

in Los Angeles is $106,000, and the average mean salary earned by animators in Portland is

$84,560, a delta of more than $20,000 at the mean. *Id.* To ignore that disparity means that

individuals of extraordinary ability working outside of our major metropolitan areas could never

compete with individuals of even average ability working in Los Angeles and New York. That

arbitrary result is poignantly reflected in USCIS's analysis here, where it penalizes Berardo,

despite working for one of the world's most prestigious animation studios, because LAIKA

happens to be located in Portland, Oregon, not Los Angeles or New York.

 For these reasons, the Court finds that USCIS's analysis was arbitrary and capricious

because it: (a) failed to compare the May 2019 BLS salary data to Berardo's 2019 salary; (b)

compared Berardo's salary only to the highest national salaries; and (c) failed to consider the

cost of living disparities between Portland and Seattle, and between Portland and the major

metropolitan areas upon which the national data is based. *See Motor Vehicles Mfrs. Ass'n*, 463

U.S. at 43 (noting that "the agency must examine the relevant data"). Based on the evidence of

record demonstrating that Berardo earns a salary well above the average animator's salary both

in Portland and nationally, and comparable to the top animators in Seattle and nationwide when

factoring in geographic cost of living disparities, the Court finds that Berardo has satisfied his

burden of demonstrating his "high salary" under 8 C.F.R. § 204.5(h)(3)(ix).

///

### B.    "Leading or Critical Role" Criterion

### 1.    Evidence Submitted and USCIS's Denial

At step one of the analysis, Defendants also found that Berardo failed to demonstrate that

he served in a "leading" or "critical" role for an organization as set forth at 8 C.F.R. §

204.5(h)(3)(viii). (ECF No. 26-1 at 10.) To satisfy the "leading or critical role" criterion, a

petitioner must submit "[e]vidence that the alien has performed in a leading or critical role for

organizations or establishments that have a distinguished reputation[.]" 8 C.F.R. §

204.5(h)(3)(viii). Berardo alleges that USCIS erred by: (1) failing to acknowledge in its decision

his renown as the "walking animator"; (2) disregarding the contents of opinion letters; and (3)

ignoring probative, corroborating evidence of his critical role at LAIKA. (Am. Mot. Summ. J. at

13-18.) As explained below, the Court finds that USCIS's decision was arbitrary and capricious.

To satisfy the "leading or critical role" criterion, Berardo submitted documentation in the

form of five opinion letters to demonstrate his role at several animation studios. (ECF No. 26-2

at 109-31.) LAIKA's Animation Supervisor, Brad Schiff ("Schiff"), submitted a letter explaining

that Berardo animated pivotal scenes involving protagonist characters in four of LAIKA's films,

and described him as "one of the most extraordinary animators working in the field today." (ECF

No. 26-2 at 109.) As corroborating evidence, Berardo submitted an article from *Animation*

Magazine that described him as "the walk animator," and a "crucial member" of LAIKA. (ECF

No. 26-2 at 214, 209.)

In its December 20, 2019 NOID, USCIS stated that Berardo had failed to demonstrate

that he served in a leading or critical role for a distinguished organization. (ECF No. 26-1 at 39.)

USCIS noted that despite Schiff's use of the words "leading" and "critical" when referring to

Berardo, the evidence failed to demonstrate that Berardo held a formal title or leadership position

compared to other LAIKA animators. (ECF No. 26-1 at 39.) In support, USCIS pointed to the

PAGE 15 – OPINION AND ORDER

IMDb credits of films *Kubo and the Two Strings* and *The Boxtrolls* that listed Berardo as an

"animator" whereas several other animators were credited with roles such as "lead animator,"

"Key Assistant Animator," "CG facial animator," and "CG rapid prototype animator." (ECF No.

26-1 at 39.) USCIS also stated that "Mr. Schiff seems to be the one with the leading or critical

role at LAIKA as it is Mr. Schiff who has the title, Animation Supervisor, and has been

nominated for an Oscar and won an Emmy for animation." (ECF No. 26-1 at 39.)

　　　　Berardo submitted additional evidence in response to the NOID. (ECF No. 26-1 at 67-

249.) Berardo provided evidence of his animated work featured in trailers and other promotional

materials for LAIKA films. (ECF No. 26-1 at 181-241.) Berardo also submitted video evidence

that included footage of Berardo animating several different scenes from LAIKA films. (ECF

No. 26-1 at 68.) Along with this footage, Berardo included a transcript of behind-the-scenes

commentary featuring the Director of *Kubo and the Two Strings* discussing the complexity of a

"walking" scene Berardo animated for the film. (ECF No. 26-1 at 208.)

　　　　In addition, Berardo submitted an updated, thirteen-page letter from Schiff. (ECF No. 26-

1 at 114-26.) Schiff's letter elaborated on Berardo's role as LAIKA's walking animator, stating

"[t]here is literally no one on the planet who can walk a puppet as naturally as [Berardo]." (ECF

No. 26-1 at 115.) Schiff's letter also responded to the NOID's findings related to Berardo's lack

of a title. The letter explained that all of the other types of animators listed in the IMDb credits

"play support roles to the leading role of a stop-motion animator." (ECF No. 26-1 at 121.) Schiff

explained that in the field of stop-motion animation, the animator's role is analogous to an

actor's role in a live action film:

> We are a stop-motion first company. The role of stop-motion animator is that of
> an actor, not a makeup artist or other supporting role. In the same way that a
> makeup artist or costume artist supports an actor in a live action film, these other
> types of animators all play support roles to the leading role of a stop-motion

animator. Further, because [Berardo] is widely regarded in the field as one of the top stop-motion animators in the world, he is tasked with animating (acting) leading roles for our leading characters, for pivotal, critical scenes.

(ECF No. 26-1 at 121.) Berardo also submitted an additional letter written by LAIKA Producer and Head of Production Anne Sutner ("Sutner"). (ECF No. 26-1 at 110.) Sutner credited Berardo as one of the six fastest animators on the film, *Kubo and the Two Strings*, and the third fastest animator on the film, *Missing Link*. (ECF No. 26-1 at 111; 113.)

On April 3, 2020, USCIS reiterated in its second denial that Berardo failed to demonstrate his leading or critical role at LAIKA.[7] (ECF No. 26-1 at 7.) USCIS explained that, while the opinion letters described in detail Berardo's talents as a stop-motion animator, the content of the opinion letters "seem more akin to examples of someone who is simply good at their job." (ECF No. 26-1 at 8.)

## 2.    Analysis

The Court finds that USCIS's analysis of the "leading or critical role" criterion was arbitrary and capricious, and USCIS abused its discretion by disregarding important facts demonstrating Berardo's critical role at LAIKA and by failing adequately to explain why these facts were insufficient to satisfy the criterion at 8 C.F.R. § 204.5(h)(3)(viii). *See Muni*, 891 F. Supp. at 443 (holding that the then-Immigration and Naturalization Service ("INS") "acts without rational explanation (and therefore abuses its discretion) 'when it fails to weigh important factors and to state its reasons for denying relief'" (internal citation omitted)).

---

[7] The parties do not dispute that LAIKA is an organization with a distinguished reputation pursuant to 8 C.F.R. § 204.5(h)(3)(viii). *See* ECF No. 26-1, at 7 ("[T]he record established that LAIKA, Aardman Animations, and BreakThru Films are organizations that have distinguished reputations.")

First, the Court finds that USCIS disregarded much of the content of the Schiff and Sutner letters, and its conclusion that the letters describe "someone who is simply good at their job" is plainly contrary to the evidence. (ECF No. 26-1 at 8.) For example, Sutner stated that Berardo "is special in that in every film, including our latest, he has animated critical scenes with all of our hero characters. Not all animators are able to do that to the degree that he can. He's in a tiny category in that respect. For the audience, that's like inviting a super-athlete who's been to five Super Bowls and won each time." (ECF No. 26-1 at 112.) Schiff echoes this sentiment, explaining that "[n]o one else in the world can contribute this specific combination of skills to our studio with such consistency, regardless of the type of scene or character. He is one of the only stop-motion animators on our team that has animated key scenes with all our hero characters." (ECF No. 26-1 at 116.) Schiff specifically notes that Berardo "acts as the 'director' for all of the scenes for which he is responsible; as such, he is one of the few members of our production crew that has critical storytelling responsibilities." (ECF No. 26-1 at 118.)

USCIS's denial does not address why these statements, and other information in the letters, are not sufficient evidence of Berardo's performance in a leading or critical role. In fact, USCIS's treatment of the Schiff and Sutner letters directly contradicts USCIS's own guidelines, recognizing that "[t]his is one criterion where letters from individuals with personal knowledge of the significance of the alien's leading or critical role can be particularly helpful" when "the letters contain detailed and probative information that specifically addresses how the alien's role for the organization or establishment was leading or critical." AFM Manual at 10; *see also* *Chursov v. Miller*, 18-cv-2886 (PKC), 2019 WL 2085199, at *7 (S.D.N.Y. May 13, 2019) (finding that USCIS erred when it failed to examine opinion letters for evidence, "directly contradicting its Policy Manual that states 'USCIS officers should take into account the

probative analysis that experts in the field may provide . . . in order to assist in giving an assessment of the alien's original contributions of major significance'") (alteration in original).

In its decision, USCIS recognizes that it "may evaluate the content of [] letters as to whether they support the alien's eligibility" and "may even give less weight to an opinion that is not corroborated, in accord with other information or is in any way questionable." (ECF No. 26-1 at 10) (citation omitted)). The record evidence, however, corroborates rather than contradicts the contents of the letters. *See Care v. Nielsen,* Civ. No. 1:18-CV-04666-AT, 2020 WL 2528536, at *16 (N.D. Ga. May 18, 2020) (finding that USCIS acted arbitrarily in discounting opinion letter when in fact the "letter [was] supportive and in accord with all of the other materials submitted by Plaintiff").

 For example, the *Animation* article referred to Berardo as a "crucial team member[]" at LAIKA (ECF No. 26-2 at 209), a *Variety* article reported that he was the sole employee chosen to represent LAIKA at an international film festival (ECF No. 26-1 at 173), and other evidence demonstrated that Berardo was one of three panelists who presented at an exhibit of LAIKA's work at the Portland Art Museum. (ECF No. 26-1 at 242-44.) In light of the corroborating evidence, USCIS's failure to credit the Schiff and Sutner letters without a credible explanation was arbitrary and capricious. *See, e.g.*, *Rubin v. Miller*, 19 Civ. 4320 (LGS), 2020 WL 4704882, at *6 (S.D.N.Y. Aug. 13, 2020) (finding USCIS decision arbitrary and capricious when its denial did not address why statements attesting to petitioner's contributions to company was not evidence of performance in a leading or critical role); *Muni,* 891 F. Supp. at 445 n.10 (reversing denial of petition where agency ignored eight affidavits describing petitioner as an excellent hockey player and "made no effort to explain why [] affidavits were insufficient to help establish [petitioner] as a[n] [alien] of exceptional ability"); *cf. Strategati*, 2019 WL 2330181, at *7

(affirming finding that contents of seven letters "d[id] not provide specific examples of how petitioner's roles rise to the level of leading or critical consistent with this regulatory criterion") (citation omitted); *Noroozi v. Napolitano*, 905 F. Supp. 2d 535, 544 (S.D.N.Y. 2012) ("These letters, while descriptive of a highly selective process to achieve membership on the Iranian national table tennis team, simply do not describe, in any detail, how [petitioner] performed in a 'leading or critical role.'").

Further, USCIS's conclusion that Berardo is "simply one of many animators who play a role in the creation of LAIKA's successful films" ignores substantial evidence in the record regarding Berardo's particular role as the walk animator at LAIKA. (ECF No. 26-1 at 8.) The letters explained that Berardo "specializes as the walk animator" and that he "leads tutorials to teach the 'walking' skill to other animators on the stop motion team." (ECF No. 26-1 at 116; 111.) According to Sutner, Berardo is "our only stop-motion animator on a team of as many as thirty, who can 'walk' a puppet as effectively as we need so that the puppet's gait and movement appear totally smooth and natural on screen[.]" (ECF No. 26-1 at 111.) *Animation* Magazine further corroborates Berardo's critical role at LAIKA. The article states, "On *Kubo* . . . Berardo became known as the 'walk animator.'" (ECF No. 26-2 at 214.) The article includes excerpts from an interview with Berardo, during which he explains why walking a puppet is one of the most difficult things to animate. (ECF No. 26-2 at 214.) Berardo's leading and critical role was also corroborated by other evidence in the record, including photos, promotional materials, and transcripts from a Director's commentary. For example, in providing commentary on a scene from *Kubo and the Two Strings*, the Director explains, "[t]hese shots here were really challenging, because, you know, walking a puppet is really, really hard. And our animator Ludo Berardo, had to animate three of them[.]" (ECF No. 26-1 at 208.)

Instead of seriously evaluating these opinion letters and corroborating industry materials, USCIS supported its finding that Berardo fails to meet the "Leading or Critical Role" criterion based on Berardo's title listed in IMDb film credits. *See* ECF No. 26-1 at 7-8 ("[I]t appears from the credits for *The Boxtrolls* listed on IMDb that the self-petitioner was one of approximately 60 people who were listed as some type of animator."); *see also* ECF No. 26-1 at 9 (explaining that "the fact that Mr. Schiff holds the title of Animation Supervisor would indicate that LAIKA does have a formal system of titles to indicate their leading or critical employees[.]"). Basing its conclusion on Berardo's title only is contrary to USCIS's own agency guidance, which directs that "[i]t is not the title of the alien's role, but rather the alien's performance in the role that determines whether the role is (or was) critical." AFM Manual at 10. USCIS latched on to its conclusion that Berardo lacked a "distinctive" title based on its review of the IMDb, and ignored portions of Schiff's letters explaining the significance of various title distinctions among LAIKA animators. *See, e.g.*, *Grimson*, 1995 WL 134755, at *3-4 (remanding denial after concluding that INS ignored probative portions of evidence and focused solely on negative facts).

For these reasons, the Court concludes that USCIS abused its discretion by arbitrarily discounting opinion letters and corroborating materials demonstrating Berardo's leading and critical role as the "walking animator" at LAIKA. *See* *Rubin*, 2020 WL 4704882, at *6 (finding USCIS's determination that petitioner failed to satisfy leading or critical role criterion was contrary to contents of opinion letter evidence); *Grimson*, 1995 WL 134755, at *3-4 (recognizing the petitioner hockey player's specialized and essential role as "enforcer" as relevant to determining his eligibility and finding agency's "decision to reject out of hand plaintiff's particular abilities as a hockey player" an abuse of discretion). Based on the evidence of record, the Court finds that Berardo satisfied his evidentiary burden under 8 C.F.R. § 204.5(h)(3)(viii).

### C.    Final Merits Determination

At the final merits stage, USCIS analyzes whether the totality of the evidence demonstrates that the petitioner has attained both "[a] level of expertise indicating that the individual is one of that small percentage who have risen to the very top of the field of endeavor[,]" 8 C.F.R. § 204.5(h)(2), and "that the alien has sustained national or international acclaim and that his or her achievements have been recognized in the field of expertise." 8 C.F.R. § 204.5(h)(3); *Kazarian*, 595 F.3d at 1119-20.

### 1.    "High Salary" and "Leading or Critical Role" Criteria

In its final merits determination, USCIS did not discuss any of the evidence Berardo submitted in support of the "High Salary" and "Leading or Critical Role" criteria. For the reasons stated, Berardo satisfied those criteria, and therefore USCIS abused its discretion by failing to consider those criteria in its final merits determination.[8] *Cf. Rijal*, 772 F. Supp. 2d at 1348 (finding that despite USCIS's erroneous conclusions that certain evidence did not satisfy threshold evidentiary criteria, the petitioner suffered no prejudice at the final merits stage because "USCIS explicitly considered all of the evidence [petitioner] offered" and "[i]n the course of reviewing each evidentiary criterion, USCIS articulated rational reasons that [the petitioner] did not demonstrate 'extraordinary ability'").

### 2.    Other Criteria

The Court also finds that USCIS abused its discretion in its final merits determination by arbitrarily evaluating the evidence Berardo submitted in support of at least three of the four

---

[8] While USCIS is correct that it is not required to address in its decision every piece of evidence a petitioner submits, it did not evaluate any evidence from these two criteria in it final merits determination.

criteria USCIS acknowledged he satisfied: (1) "Judging Work of Others"; (2) "Display of

Work"; and (3) "Commercial Success in the Performing Arts."

a.       **"Judging Work of Others"**

In support of the "Judging Work of Others" criterion, Berardo produced evidence that he

had served as a juror for two international film festivals. (ECF No. 26-2 at 266-95.) In his letter,

Schiff provided expert testimony describing the prestige associated with being selected as a juror

at a film festival. (ECF No. 26-1 at 123.) Schiff explained that "as an expert in the field of stop-

motion animation, [] being invited even once to serve as a juror in a major film festival is

evidence of a stop-motion animator having risen to the top of his field." (ECF No. 26-1 at 123.)

Schiff also noted that "[i]f film festival organizers (who are highly involved in the field and

aware of who is well known in the industry) were to select unknown or unqualified judges . . . ,

they would quickly go out of business." (ECF No. 26-1 at 123.) In its decision, USCIS stated that

it found Schiff's testimony "not persuasive," and instead relied on its own expertise of stop-

motion animation festivals, concluding that "[f]ilm festivals may select judges for a variety of

reasons, as is often seen with 'celebrity judges.'" (ECF No. 26-1 at 15.)

The record evidence demonstrates that the selection criteria for judging a stop-motion

animation festival is not based upon an individual's celebrity status. For example, the brochure

for the Montreal Stop-Motion Festival lists the biographies of the jurors, all of which described

distinguished careers in the field of animation. (ECF No. 26-2 at 268-69.) Similarly, the brochure

for the Northwest Animation Festival states that the jury is "a hand-picked team of 130 festival

alumni, local animators, and super-fans." (ECF No. 26-2 at 279.) USCIS erred by not explaining

its basis for rejecting Schiff's testimony other than to state it "adds little to the self-petitioner's

case." (ECF No. 26-1 at 14); *see, e.g., Button Depot, Inc. v. U.S. Dep't of Homeland Sec.*, 386 F.

Supp. 2d 1140, 1148 (C.D. Cal. 2005) (finding that USCIS abused its discretion by not indicating

any basis for its conclusion that it "does not agree with the opinion evidence submitted by the petitioner") (citation and internal quotation omitted).

USCIS also concluded that submitting only two examples of serving as a judge at an international animation festival was not probative of someone who had risen to the top of their field, because "in other fields such as scientific research, acting as a judge or reviewing material for scientific journals is quite common." (ECF No. 26-1 at 14.) USCIS did not explain how reviewing scientific journal articles is a relevant comparator to Berardo's selection as a juror at international stop-motion animation festivals. A more relevant analysis would compare the frequency of other stop-motion animators' selection to serve as jurors at similarly prestigious international film festivals. USCIS's evaluation of this criterion is another example of USCIS's arbitrary apples-to-oranges comparisons, and was an abuse of discretion.

### 3.    "Display of Work"

To satisfy the "Display of Work" criterion, Berardo submitted: (1) documentation of a film screening of LAIKA's films at the Fete de L' Anim Festival in France; (2) promotional materials from a film screening at Universal Studios titled *From Coraline to Kubo: A Magical Laika Experience*; and (3) documentation from exhibits in San Diego and in Portland featuring LAIKA films. (ECF No. 26-2 at 50-78.)

In its decision, USCIS found that because Berardo was "one of dozens of animators who created the films showcased at these events, the acclaim evidenced by such a display is not on par with a visual artist whose work is the subject of a solo exhibition." (ECF No. 26-1 at 15.) This comparison, however, overlooks clear distinctions between a solo visual artist and a stop-motion animator employed by an animation studio—namely, that art produced and displayed by an organization like LAIKA is necessarily collaborative and cannot reasonably be compared to an exhibition of work produced by an individual artist. To determine if Berardo had risen to the

PAGE 24 – OPINION AND ORDER

top of his field, USCIS compared Berardo's display of work to the display of work in a different field, and USCIS's failure to consider these distinctions in its analysis was arbitrary and capricious. *See Motor Vehicle Mfrs. Ass'n*, 463 U.S. 29 at 43 (defining agency action as arbitrary and capricious when it "fail[s] to consider an important aspect of the problem").

### 4.    "Commercial Successes"

For the "Commercial Successes" criterion, Berardo submitted box office receipts from his LAIKA films, *Kubo and the Two Strings*, *The Boxtrolls*, and *Paranorman*. USCIS found that Berardo's "actual role with the films was a part of a cast and crew of many" and that because the films also featured celebrity voice actors, "[i]t would be an overstatement to say that the commercial success of these movies was due to [Berardo's] ability as an animator." (ECF No. 26-1 at 15.)

To support its conclusion, USCIS refers only to a sentence in a *Variety* article submitted by Berardo that states "'The Missing Link' is scheduled to release next year, and stars Hugh Jackman, Zoe Saldana, and Zach Galifianakis, and was one of the most talked-about films in production at this year's Annecy festival." (ECF No. 26-1 at 173.) This statement does not tie the voice actors to the fact that the movie was one of the most talked-about films in production, and USCIS does not articulate how this one statement demonstrates that celebrity voice actors, as opposed to state-of-the-art stop-motion animation, are responsible for the commercial success of LAIKA films. Although by their nature films are necessarily collaborative and these films were not commercially successfully due only to Berardo's contributions, USCIS appears to base its conclusion that the commercial success of LAIKA films is attributable to celebrity voice actors on USCIS's own opinion. Importantly, nothing in the record ties the Academy Award nominations for the films *The Boxtrolls*, *ParaNorman*, and *Kubo and the Two Strings* to the

actor's voices. (ECF No. 26-2 at 141-73.) For these reasons, the Court finds USCIS's evaluation of the evidence was arbitrary and capricious and an abuse of discretion.

### 5. Summary

For the reasons discussed above, the Court finds that USCIS's evaluation of the evidence here was arbitrary and capricious, an abuse of discretion, and not in accordance with the law. From the initial denial to the final denial, the outcome of Berardo's petition appears to have been preordained, and the final denial does not reflect a serious evaluation of Berardo's evidence of extraordinary ability in the field of stop-motion animation. The Court agrees that Berardo did not receive a fair adjudication here.

### D. Remand

Berardo asks the Court to order USCIS to grant his petition, asserting that the record is fully developed and a court-ordered approval is appropriate here. (Pl. Am. Mot. Summ. J. at 33.) In the alternative, Berardo asks the Court to remand for further proceedings, but retain jurisdiction of this matter in the event he seeks further judicial review. (Pl.'s Am. Mot. Summ. J. at 34-35.)

There is support for Berardo's request to grant approval of his petition. *See, e.g.*, *RELX, Inc.*, v. *Baran*, 397 F. Supp. 3d 41, 56 (D.D.C. 2019) (ordering USCIS to grant Plaintiff's petition); *3Q Digital, Inc., v. U.S. Citizenship & Immigration Servs.*, 1:19-cv-579-RCL, 2020 WL 1079068, at *7 (D.D.C. Mar. 6, 2020) (same). However, "if the agency has not considered all the relevant factors . . . the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation." *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985). "Especially 'in the field of immigration,' where 'there may be sensitive issues lurking that are beyond the ken of the court,' the 'course of prudence' is to remand the case to

USCIS[.]" *Doe v. U.S. Citizenship & Immigration Servs.*, 239 F. Supp. 3d 297, 309 (D.D.C. Mar. 10, 2017) (quoting *Fox v. Clinton*, 684 F.3d 67, 80 (D.C. Cir. 2012)).

The Court finds that it is appropriate to provide USCIS with the opportunity to reevaluate its final merits determination in light of the Court's findings herein. In addition, on remand USCIS should consider the three additional opinion letters Berardo submitted from animation industry experts. For example, Peter Lord, co-founder and Creative Director of Aardman Animations, states that Berardo "is a well-recognized authority in the animation industry" and that "[h]is work has proven extremely significant in elevating the standards for stop-motion animation for Aardman Animations, as well as around the world." (ECF No. 26-2 at 117.) Martin Clapp, Director at Breakthru Films, states that Berardo "is an animator who is a member of a small, elite group of animators who are consistently in high demand" and that he "produces work that not only succeeds, but also reaches the highest echelons of artistic achievement." (ECF No. 26-2 at 127-28.) Guionne Leroy, a Belgian Stop-Motion and CGI Animation Director, states that Berardo "is renowned all over the world for his animations that give his productions a sense of fantastic realism, and his artistic expertise in this regard sets him apart as an individual operating at the very top of the profession." (ECF No. 26-2 at 131.)

Furthermore, on remand USCIS should provide Berardo with an alternative format to submit his video evidence. In response to USCIS's NOID, Berardo submitted video evidence contained in a CD and thumb drive which included: (1) promotional materials featuring Berardo's animation; (2) behind the scenes video footage of Berardo animating several scenes from *Kubo and the Two Strings* and *Missing Link*; (3) video of several animated scenes with Directors' commentary; and (4) video of the Portland Art Museum LAIKA Sunday panel held on May 20, 2018 featuring Berardo as a panelist. (ECF No. 26-1 at 68; 247.) USCIS did not review

this evidence, on the ground that "[e]vidence submitted on removable media, such as thumb

drives, flash drives, CDS, DVDs, etc., cannot be viewed on government computers and will not

be considered." (ECF No. 26-1 at 6.) If USCIS is not capable of reviewing videos on digital

media, it should provide Berardo with an opportunity to present the same evidence in a different

format.

The Court remands this case to USCIS for further adjudication in accordance with the

findings of the Court.

**CONCLUSION**

For the reasons set forth above, the Court GRANTS Berardo's Amended Motion for

Summary Judgment (ECF No. 20), DENIES Defendants' Motion for Summary Judgment (ECF

No. 28), and DENIES AS MOOT Berardo's (Original) Motion for Summary Judgment (ECF No.

17). The Court REMANDS this case for further administrative proceedings in accordance with

the Court's findings, and the undersigned retains jurisdiction for any further appeals.

**IT IS SO ORDERED.**

DATED this 20th day of October, 2020.

_Stacie F. Beckerman_
_____
HON. STACIE F. BECKERMAN
United States Magistrate Judge